# In the United States Court of Federal Claims

Nos. 06-517C & 06-523C

(Filed November 17, 2006)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **TEXTRON, INC.,** | * | Post-award bid protest; 28 |
| | * | U.S.C. § 1491(b)(1) (2000); |
| Plaintiff, | * | judgment on the administrative |
| | * | record; reasonableness of agency |
| v. | * | action; injunctive relief; best |
| | * | value procurement; standing; |
| **THE UNITED STATES,** | * | prejudice; prejudice on the |
| | * | merits. |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| **MANITOWOC MARINE** | * | |
| **GROUP/MARINETTE MARINE** | * | |
| **CORPORATION,** | * | |
| | * | |
| Intervenor-Defendant. | * | |
| | * | |
| _____ | * | |
| | * | |
| **OCEAN TECHNICAL SERVICES,** | * | |
| **INC.,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| **MANITOWOC MARINE** | * | |
| **GROUP/MARINETTE MARINE** | * | |
| **CORPORATION,** | * | |
| | * | |
| Intervenor-Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * | * | |

Frederick M. Levy, Washington, DC, for plaintiff Textron, Inc. Jason A. Carey and Matthew T. Crosby, McKenna Long & Aldridge LLP, of counsel.

Marcus B. Slater, Jr., Washington, DC, for plaintiff Ocean Technical Services, Inc. Jennifer J. Zeien, Slater & Zeien, L.L.P.; Henry W. Kinney and Michael L. DeShazo, Kinney & Ellinghausen, of counsel.

Thomas D. Dinackus, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Sean McNamara, Department of Justice; Isaac Johnson and John Ralston, United States Coast Guard, of counsel.

Richard J. Conway, Washington, DC, for intervenor Manitowoc Marine Group/Marinette Marine Corp. Michael J. Slattery and Austin Fulk, Dickstein Shapiro, LLP, of counsel.

**MILLER**, Judge.

## OPINION 1/

This post-award bid protest action filed by plaintiffs Textron, Inc. ("Textron"), and Ocean Technical Services, Inc. ("O-Tech"), is before the court subsequent to argument on cross-motions for judgment on the administrative record. Textron and O-Tech (collectively "plaintiffs") seek to enjoin permanently the performance of the contract awarded to intervenor-defendant Marinette Marine Corporation ("Marinette") by the United States Coast Guard (the "USCG") under Solicitation No. HSCG23-05-R-ARB001 (the "Phase II Solicitation") for the design and construction of the Response Boat-Medium (the "RB-M"). This is a major multi-year procurement for the USCG. The RB-M fleet is one part of the USCG's on-going effort to modernize and standardize its fleet.

Assuming that injunctive relief is not granted, but that the procurement is found to be defective, plaintiffs seek costs accrued in preparing their bids and proposals from the procurement process. Plaintiffs also demand reimbursement for attorneys' fees and the cost of litigating these actions.

_____

1/ This opinion was issued under seal on November 8, 2006. The parties were given the opportunity to notify the court by November 15, 2006, to identify protected/privileged material subject to deletion before publication. Redactions are denoted by brackets.

The parties developed their schedule for briefing, and the court resolved the objections to extending it. <u>See</u> Order entered July 18, 2006, ¶ 4-10. Oral argument on the motions was held on October 18, 2006. Although the court had promised to enter a ruling four days after oral argument, <u>see</u> Order entered July 18, 2006, ¶ 9, the most recent request for extension pushed that date into a period during which the court was conducting a two-week trial out of the District of Columbia. <u>See</u> Order entered Sept. 19, 2006, ¶ 1 (granting, in part, defendant's motion for enlargement of time to file cross-motion and opposition). Therefore, the court advised the parties during oral argument that the earliest date for decision was this date.

## FACTS AND PROCEDURAL HISTORY

The undisputed factual backdrop to this opinion involves a four-year procurement process conducted in two phases ("Phase I" and "Phase II"). On August 10, 2002, the USCG issued Solicitation No. HSCG23-02-R-ARB048 (the "Phase I Solicitation") for the design and production of a RB-M test boat, a versatile boat capable of performing various USCG missions, including search and rescue, enforcement of laws and treaties, and defense operations. Following an evaluation of the Phase I proposals, the USCG, on May 2, 2003, awarded contracts to Textron, O-Tech, and Marinette to participate in Phase II. AR 00701. <u>2</u>/

Textron, a Delaware corporation, controls Textron Marine & Land Systems, the New Orleans-based division of Textron, that prepared and submitted the proposals at issue. O-Tech, a Louisiana corporation and a Small Disadvantaged Business, 15 U.S.C. §§ 631-657f (2000), is a full-service shipyard and marine construction facility, constructing vessels in fiberglass, aluminum, and steel. Marinette, a division of the Manitowoc Marine Group, based in Marinette, Wisconsin, has designed, built, and delivered more than 1,300 vessels for government and commercial customers over its sixty-three year history. AR 40115-16.

The Phase I contracts required Textron, O-Tech, and Marinette each to produce a single RB-M test boat, which they delivered on October 29, 2003. AR 00701. Upon receipt of the RB-M test boats, the USCG conducted extensive in-water testing and made performance measurements. AR 00586. The USCG crews also rode in the test boats and provided portions of their comments to the Phase I contractors. AR 00586. By April 2004 testing on the Phase I boats was complete. AR 40114.

---

<u>2</u>/  The court cites to the administrative record, as supplemented ("AR"), when a document is not self-identifying or when the record is quoted.

The USCG issued the Phase II Solicitation on April 25, 2005.  AR 00583.  The contract ultimately was a negotiated best-value award, based on technical and price proposals that were subject to a tiered review structure, guided by the criteria announced in the Phase II Solicitation.  The Phase II Solicitation contemplated the award of a single contract for the design of the RB-M, including data rights thereto, and production of boats according to that design.  AR 00701-02.  It included the option for production of up to 180 boats, as well as various technical and support services to be provided over a period of up to eight years.  AR 00586.  Pursuant to an approved Justification for Other than Full and Open Competition, only Textron, O-Tech, and Marinette were invited to participate in Phase II.  AR 01663.

The Phase II Solicitation relaxed the maximum permissible beam requirements, set at fourteen feet overall in Phase I, to fifteen feet overall in Phase II.  Compare AR 00876 with AR 50003.  Each offeror was free to change its design to incorporate the new beam allowance, to propose a new RB-M design entirely, or to propose the same design, as long as they conformed to the minimum requirements of the Phase II Solicitation.  AR 00991.

On November 7, 2005, the contracting officer for the RB-M procurement decided to exclude O-Tech and Textron from the competitive range.  AR 71824.  Following this notice of the contracting officer's decision, O-Tech filed a bid protest with the Government Accountability Office (the "GAO") on December 22, 2005.  Compl., Ocean Tech. Services, Inc. v. United States, No. 06-151C, ¶ 77 (Fed. Cl. Feb. 28, 2006).  The following day, Textron filed its protest.  On February 21, 2006, O-Tech withdrew its GAO protest and sued in the United States Court of Federal Claims.  Subsequently, by order entered on March 3, 2006, O-Tech's action was consolidated with Textron, Inc. v. United States, No. 06-161C (Fed. Cl. Mar. 2, 2006), and Marinette intervened.  Ocean Tech. Services, Nos. 06-151C, & Textron, No. 06-161C ¶1 (Fed. Cl. Mar. 3, 2006) (order consolidating cases).

On March 16, 2006, the USCG, through its counsel, telephonically informed this court and the parties that it had opted to take unilateral corrective action by reinstating Textron and O-Tech to the competitive range determination and reopening discussions.  See Ocean Tech. Services, Nos. 06-151C & 06-161C (Fed. Cl. Mar. 16, 2006) (order dismissing complaints without prejudice and retaining jurisdiction to monitor discrete issues) (the "March 16 Order").  Accordingly, the court dismissed plaintiffs' claims without prejudice, retaining jurisdiction to monitor, inter alia, Textron's allegations that improper action had been taken by the USCG with regard to Textron's teaming member, EDO Corporation ("EDO").  Id. ¶ 2.  On May 17, 2006, defendant filed a status report advising that the Government had found no evidence to suggest that procurement laws had been violated.  See Def.'s Status Report, Nos. 06-151C & 06-161C, filed May 17, 2006, at 2-3.  Final judgment was entered on May 18, 2006.  Eighteen days after final judgment was entered, on June 5, 2006, Textron filed its own status report  to reserve "its right to protest in the event that [Marinette] names EDO as

4

a teaming member." Textron's Status Report, Nos. 06-151C & 06-161C, filed June 5, 2006, at 3.

The procurement before the court was, as prescribed by section M.3 of the Phase II Solicitation, a negotiated best-value selection. AR 00999. In accordance with section M.2 and M.3 of the Phase II Solicitation, the Source Selection Authority (the "SSA") determined that Marinette's offer was the most "advantageous" to the Government using a "trade-off process" in the source selection approach. AR 00999. "In this process, the Non-Price area [was considered] significantly more important than Price." AR 01000. Each of the non-price evaluation factors–management, systems engineering, mission effectiveness, and support–was to be considered equally. AR 01000. The "Response Boat Medium (RB-M) Proposal Evaluation Procedures" (the "PEP") directed the USCG evaluators to review each proposal and identify deficiencies, significant weaknesses, strengths, and risks. AR 00619. Evaluators were then to assign a "technical rating" and "risk rating" to each of the four non-price factors. AR 40755-56, AR 00617. Price was evaluated for "completeness, price reasonableness, cost realism and unbalanced pricing." AR 01000.

The discussion period following the USCG's corrective action concluded on April 6, 2006. AR 40114. On April 27, 2006, the USCG received the Final Proposal Revisions (the "FPR") from Marinette, Textron, and O-Tech. AR 40114. The USCG announced the award of the Phase II contract to Marinette on June 26, 2006, AR 40749, 40750, and O-Tech protested to the GAO on July 10, 2006. Textron filed its complaint in the Court of Federal Claims on July 12, 2006. On July 17, 2006, the GAO dismissed O-Tech's protest, and O-Tech filed an identical complaint in the Court of Federal Claims. Once again, plaintiffs' cases were consolidated, and Marinette intervened. See Order entered July 14, 2006, ¶¶ 2, 16. Textron then moved for a preliminary injunction, followed by O-Tech; Textron, O-Tech, Marinette, and defendant each filed separate briefs.

Following argument on the motions for preliminary injunction on July 19, 2006, the court ruled from the bench that plaintiffs had not established their entitlement to a preliminary injunction. A Memorandum Order and Opinion, entered July 20, 2006, memorialized the ruling. See Order entered July 20, 2006. The court found that the loss of an opportunity to compete for a contract on a level playing field sufficiently established irreparable harm for plaintiffs and ruled that, given the leisurely pace of the procurement, defendant's argument with regard to its national security and defense needs was unpersuasive. Id. at 3-4. Nevertheless, Marinette easily refuted plaintiffs' factual claims, based only on "information and belief," which belied plaintiffs' ability to demonstrate a likelihood of success on the merits. Id. at 5-7. Therefore, the court denied preliminary injunctive relief. Id. at 7; see Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 953 (Fed. Cir. 1990) (holding that "the absence of an adequate showing with

regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial").

On August 25, 2006, O-Tech and Textron moved for summary judgment on the administrative record pursuant to RCFC 52.1(b). Marinette and defendant filed cross-motions for summary judgment on September 15, 2006, and September 22, 2006, respectively. On July 25, 2006, defendant filed the initial administrative record, which was supplemented without objection four times between July 26-31, 2006. See Notices of Filing filed July 25-28, 2006; Order entered July 31, 2006 ¶ 1 (granting defendant's unopposed motion to supplement). Thereafter, plaintiffs moved to compel defendant to file the complete administrative record. The motion was granted after a hearing on August 10, 2006. See Order entered Aug. 10, 2006 ¶¶ 1-2 (granting, in part, plaintiffs' motions to compel filing of the administrative record). The administrative record again was supplemented on August 21, 2006; on September 8, 2006; and finally on September 21, 2006, following briefing. See Orders entered Aug. 21, 2006, Sept. 8 & 21, 2006. Because this case implicates two protests, a two-phase procurement, and the significant timing of the conduct of a renegade consultant, the court has attached a time line of events as Appendix A to this opinion.

## DISCUSSION

I. Standard of review

The Court of Federal Claims has jurisdiction over actions brought by unsuccessful offerors in a government procurement pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Disputes Resolution Act of 1996, Pub. L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (codified at 28 U.S.C. § 1491(b)) (the "ADRA").

A. Standing

As the United States Court of Appeals for the Federal Circuit has had occasion to note, the history of judicial review in bid protest decisions is "both long and complicated." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1331 (Fed. Cir. 2001) (offering summary of history of bid protest judicial review) ("Garufi"). In 1996 Congress clarified the Court of Federal Claims' bid protest jurisdiction when it passed the ADRA, 28 U.S.C. § 1491(b)(1) (2000). The Federal Circuit considered the meaning of the revised jurisdictional grant in Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1298 (Fed. Cir. 2001) ("AFGE"), concluding that the term "interested party" of section 1491(b)(1) should be construed "in accordance with the [Competition in Contracting Act,]" 31 U.S.C. § 3551(2) (2000). AFGE, 258 F.3d at 1302.

Accordingly, as a threshold matter, to have standing a protestor must demonstrate that it is an "interested party objecting to a solicitation by a Federal agency." 28 U.S.C. § 1491(b)(1). To meet this standard, an "interested party" must show that it is (1)"'an actual or prospective bidder[] or offeror[;]'" and (2) its "'direct economic interest [is] affected by the award of the contract or by failure to award the contract.'" Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (quoting AFGE, 258 F.3d at 1294, and adopting the language of CICA § 3551(2)(A) (emphasis omitted)); see also Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1352 (Fed. Cir. 2004).

In applying the narrow standard adopted in AFGE, 258 F.3d 1302, the Federal Circuit has construed the second element, the "direct economic interest" prong, to mean that a successful protestor must also establish that the errors complained of caused prejudice. Id. "Prejudice (or injury) is a necessary element of standing." Myers Investigative and Security Serv., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002). The requisite showing of prejudice to establish standing is satisfied when a protestor demonstrates that, absent the alleged error, a "substantial chance" exists that it would have received the contract award. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005); see also Myers, 275 F.3d at 1370 (stating that "the substantial chance rule continues to apply"); Rex, 448 F.3d at 1308 (stating that, "to prove a direct economic interest . . . , [a protestor] is required to establish that it had a 'substantial chance' of receiving the contract"). As applied by the courts, this appealingly straightforward standard has proven to be the source of considerable confusion.

Recent in-depth review of case law undertaken by Judge Braden reveals judicial interpretation of the substantial-chance standard has been anything but consistent. See Comprehensive Health Services, Inc. v. United States, 70 Fed. Cl. 700, 717-18 (2006). Since 1990 the substantial-chance requirement has been construed as requiring everything from a "greater than insubstantial" chance of success on the merits, Information Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003), to a "reasonable" likelihood of receiving the award but for the alleged error, Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562-63 (Fed. Cir. 1996), to allowing only protest by the second-lowest bidder, United States v. Int'l Bus. Machines Corp., 892 F.2d 1006, 1011 (Fed. Cir. 1990).

As will be discussed more thoroughly in this opinion, confusion over the standard of prejudice is further compounded because, in addition to being an element of standing, a showing of prejudice is required before injunctive relief is granted. Bannum, 404 F.3d at 1353; Banknote, 365 F.3d at 1351. Although both of these showings of prejudice theoretically may be satisfied by the same demonstration of a "substantial chance" of receiving the award but for the alleged error, see Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Myers, 275 F.3d at 1370, the practice has varied. The

prejudice requirement for standing generally has been satisfied by the mere showing that a protestor "could compete for the contract," Myers, 275 F.3d at 1370. At the same time, some cases have examined more closely the merits-based showing required for injunctive relief as a threshold requirement for standing. See, e.g., Galen Med. Associates v. United States, 369 F.3d 1324, 1330-31 (Fed. Cir. 2004) (prejudice not found when protestor could not meet requirements of solicitation because it lacked the requisite facilities); Data Gen., 78 F.3d at 1563 (prejudice not suffered when, despite pricing error, protestor's prices remained substantially higher).

Historically, success in compartmentalizing the two requisite prejudice showings has been limited. See, e.g., Alfa Laval, 175 F.3d 1365. In Alfa Laval v. United States, 40 Fed. Cl. 215, 234-35 (1998), rev'd & remanded, 175 F.3d 1365 (Fed. Cir. 1999), a merits-based discussion of prejudice, this court ruled that, although a contract had been awarded based on a proposal that was technically incomplete, no prejudice existed because of the "colossal" price difference between the incomplete proposal and the only other proposal available for consideration. Alfa Laval, 40 Fed. Cl. at 234-35. On appeal the Federal Circuit reversed after applying the more lenient standard of prejudice reserved for issues of standing, i.e., determining that the protestor met all the qualifications for award. Alfa Laval, 175 F.3d at 1367. The result is conflation of the respective standards for prejudice as an element of standing and prejudice as a gauge for determining whether a defect in a procurement decision is insufficient to overturn it.

Recently, in Fisher v. United States, 402 F.3d 1167 (Fed. Cir. 2005) (en banc), the Federal Circuit elaborated upon the nuanced approach required in cases where jurisdictional determinations risk overlapping with discussions of the merits. See also Metz v. United States, No. 05-5158, 2006 WL 2727205 (Fed. Cir. Sept. 18, 2006). The Federal Circuit held that the Court of Federal Claims' jurisdiction under a provision in the Tucker Act, 28 U.S.C. § 1491(a)(1), which provides jurisdiction only for claims brought under the Constitution, statutes, or regulations that allow for money damages against the United States, prescribed a one-step process. 402 F.3d at 1172-73. The determination that a source of law is money-mandating resolves both the court's jurisdiction and the character of the money mandating source. Id. The court then should proceed to the merits. Id.

The case at bar risks plunging the court into a two-step approach similar to the one that the Fisher court overruled en banc. The analysis discredited in Fisher would have preserved jurisdiction based on a non-frivolous allegation unless a decision on the merits undercuts it, in which case dismissal would be for lack of jurisdiction. See id. at 1172. For example, Marinette responded to O-Tech's motion by asserting that, inter alia, O-Tech lacks standing because, due to its disqualifying rating in Systems Engineering, even if an error occurred, as a non-contender, O-Tech was not prejudiced. See Marinette's Br. (O-Tech)

filed Sept. 15, 2006, at 21. Addressing Marinette's contentions presupposes discussion of the merits, which would lead the court in a round-robin through the arguments on the merits in order to resolve a jurisdictional issue. Such is not a desirable or appropriate procedure.

An approach similar to that of <u>Fisher</u> should be adopted to address the requisite showing of prejudice. While focusing on the status of the protestor is appropriate for assessing standing, a merits-based determination of actual prejudice should be treated separately. This approach is particularly suited to the instant case. Notably, it would avoid examining the parties' arguments on the merits in order to resolve standing by employing a standard that requires only that a protestor be (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations. Further, by explicitly allowing for two separate analyses, no confusion should exist that a successful showing to establish standing augurs success when the protestor attempts to meet the standard of prejudice for injunctive relief. See <u>United States v. John C. Grimberg Co.</u>, 702 F.2d 1362, 1372 (Fed. Cir. 1983) (granting injunctive relief reserved for exceptional cases).

B. <u>Standard of review of a bid protest in a negotiated procurement</u>

In evaluating an agency procurement decision, the ADRA directs the court to use the standard of review set forth in section 706 of title 5, <i>i.e.</i>, the Administrative Procedure Act, 5 U.S.C. § 706 (2000) (the "APA"); <u>see</u> 28 U.S.C. § 1491(b)(4) (2000); <u>Banknote</u>, 365 F.3d at 1350. The APA gives the court discretion to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); <u>see</u> <u>PGBA, LLC v. United States</u>, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004) (holding that ADRA, in incorporating arbitrary and capricious standard of APA, did not alter court's equitable discretion in granting injunctive relief).

The Federal Circuit restated in <u>Bannum</u>, 404 F.3d at 1351: "A bid protest proceeds in two steps. First, . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract." 3/ <u>Bannum</u>, 404 F.3d at 1351; <u>see</u> <u>Banknote</u>, 365 F.3d at 1351; <u>Info. Tech. Applications Corp. v. United States</u>, 316 F.3d 1312, 1318-19 (Fed. Cir. 2003); <u>Garufi</u>, 238 F.3d at 1333;

───────────────

3/ This language encompasses the alternative ground for a bid protest: whether the agency action constituted a clear and prejudicial violation of an applicable procurement regulation. See <u>Garufi</u>, 238 F.3d at 1335.

9

Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996).  Second, if the court finds that the agency acted in violation of the APA standard, "then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."  Bannum, 404 F.3d at 1351.  In either case a plaintiff bears the "heavy burden" of proving a lack of rational basis or a violation of the law by a preponderance of the evidence.  Garufi, 238 F.3d at 1333.

     C.  Standard for reviewing negotiated procurement depending on nature of challenge

In making the initial determination whether the agency action lacks rational basis or is contrary to law or regulation, the court applies two analyses depending on the nature of the challenge.  For an agency action to possess a rational basis, "'the contracting agency [must] provide[] a coherent and reasonable explanation of its exercise of discretion.'"  Garufi, 238 F.3d at 1332 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)).  An agency is entitled to wide discretion in its evaluation of bids.  Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994).  The court must not substitute its judgment for that of the agency; rather, it should defer to the agency's analysis so long as it has substantial basis in fact.  See id.; see also Camp v. Pitts, 411 U.S. 138, 142-43 (1973); Fed. Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972);  In re Sang Su Lee, 277 F.3d 1338, 1344  (Fed. Cir. 2002).

In particular, technical ranking decisions made by the agency are "minutiae of the procurement process . . . , which involve discretionary determinations of procurement officials that a court will not second guess."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); see CCL Serv. Corp. v. United States, 48 Fed. Cl. 113, 120 (2000).  When government officials are granted in such situations a great deal of discretion, the "aggrieved party faces a higher burden."  CCL Serv., 48 Fed. Cl. at 120 (citing Burroughs Corp. v. United States, 617 F.2d 590, 597-98 (Ct. Cl. 1980)).  "Thus, '[i]n reviewing [plaintiff's] protest of the agency's technical evaluation and decision to eliminate an offeror from the competitive range, we will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation.'"  Id. (quoting In re Beneco Enterprises, Inc., 70 Comp. Gen. 574, 576 (1991)).  Because the procurement in this case is a negotiated "best value," AR 00999, "the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests."  Galen Med., 369 F.3d at 1329 (citing LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1555 (Fed. Cir. 1995), and Burroughs, 617 F.2d 590).

Agency procurement procedures that are contrary to applicable laws and regulations also violate the APA standard.  5 U.S.C. § 706(2)(A); Bannum, 404 F.3d at 1351; Garufi, 238 F.3d at 1335; Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085-86

(Fed. Cir. 2001).  Federal law requires an agency to "evaluate . . . competitive proposals and make an award based solely on the factors specified in the solicitation."  10 U.S.C.  § 2305(b)(1)(2000).  In contrast with the analysis of whether the agency decision has a rational basis, an agency has no discretion regarding the mandate of applicable laws and regulations. It is irrelevant whether the agency views the regulation or requirement of the solicitation as important; the agency is bound strictly by its terms "'regardless of the panel's view of the appropriateness of the standard.'"  Alfa Laval, 175 F.3d at 1367-68 (quoting Alfa Laval, 40 Fed. Cl. at 230.

D.  Standard of review for judgment on the administrative record

The parties filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1.  4/  Rule 52.1 provides a procedure for expedited trial on a "paper record, allowing fact-finding by the trial court."  Bannum, 404 F.3d at 1356.  Unlike a motion for summary judgment, a genuine dispute regarding a material fact will not preclude a judgment on the administrative record.  See id.  The parties are restricted to the agency record and any supplementation consistent with RCFC 52.1.  See RCFC 52.1, rules committee note (2006). The court must make findings of fact from this record as if it were conducting a trial. Bannum, 404 F.3d at 1357.

In certain circumstances the administrative record may be supplemented.  Garufi, 238 F.3d at 1338 (stating that supplementation is appropriate where "required for meaningful judicial review"); GraphicData LLC v. United States, 37 Fed. Cl. 771, 778-80 (1997); see also CCL Serv., 48 Fed. Cl. at  118-20.  In general, the court will supplement the administrative record when it is necessary for a full and complete understanding of the issues. Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) (allowing supplementation of "evidence without which the court cannot fully understand the issues").

E.  Standard for obtaining injunctive relief

Plaintiffs ask that the USCG be enjoined from awarding the contract to Marinette. The Federal Circuit has characterized the award of injunctive relief as "extraordinary" and only to be granted in limited circumstances.  John C. Grimberg Co., 702 F.2d at 1372.  In order to obtain an injunction, a protestor must demonstrate by a preponderance of the evidence that (1) it succeeds on the merits; (2) it will suffer irreparable harm if injunctive

---

4/  RCFC 56.1 was withdrawn effective June 20, 2006.  RCFC 52.1 replaced RCFC 56.1.  RCFC 52.1 allows for judgment on the administrative record.

relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest. PGBA, 389 F.3d at 1228-29; FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see U.S. Ass'n of Importers of Textiles & Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005). "No one factor, taken individually, is necessarily dispositive." FMC, 3 F.3d at 427. "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." Chrysler Motors, 908 F.2d at 953.

When injunctive relief is warranted, it will only be issued upon a showing by a preponderance of the admissible evidence. See GraphicData, LLC, 37 Fed. Cl. at 779; PCI/RCI v. United States, 36 Fed. Cl. 761, 767 (1996); Stapp Towing, Inc. v. United States, 34 Fed. Cl. 300, 305 (1995); C & G Excavating v. United States, 32 Fed. Cl. 231, 235 (1994); Logicon, Inc. v. United States, 22 Cl. Ct. 776, 783 (1991). Although some judges of the Court of Federal Claims insist upon the higher "clear and convincing" standard for injunctive relief, this court repeatedly has noted that such an approach is utterly without binding precedential support. See Bannum Inc. v. United States, 60 Fed. Cl. 718, 723 (2004) (tracing line of cases advocating clear and convincing standard to another federal appellate court's statement in 1964 that "[i]njunction is a drastic remedy to be exercised with caution, and should be granted only in cases where the necessity therefor is clearly established." Goldammer v. Fay, 326 F.2d 268, 270 (10th Cir. 1964)), aff'd, Bannum, 404 F.3d at 1346.

This debate is not semantic. Securing injunctive relief is a costly process that places upon the protestor a sufficiently heavy burden without hobbling those who come to court with the challenge of, *inter alia*, obtaining preliminary injunctive relief by proving probability of success on the merits by clear and convincing evidence—a paradigm of oxymoronic legalisms. The latest case to advocate the clear and convincing standard, KSD, Inc. v. United States, 72 Fed. Cl. 236, 266 (2006), cites no binding precedent that explicitly adopts this remarkable and bizarre standard.

II. Success on the merits

_____To demonstrate success on the merits, plaintiffs must prove either that the USCG acted without a rational basis when it selected Marinette as the contractor or they must show "a clear and prejudicial violation of applicable statutes or regulations." Garufi, 238 F.3d at 1333. In addition, plaintiffs must prove that the USCG's actions prejudiced them. "[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protestor was prejudiced by that conduct." Bannum, 404 F.3d at 1351. "[T]he prejudice determination

assesses whether an adjudged violation of law warrants setting aside of a contract award." Id. at 1357.

Plaintiffs attack the procurement process at issue with four arguments. First, Textron insists that the USCG took inadequate corrective action in response to plaintiffs' previous pre-award bid protest. Plaintiffs next argue that Marinette's proposed RB-M was technically unacceptable, as it failed to meet the minimum solicitation requirements and "somehow escaped meaningful government scrutiny." O-Tech's Br. filed Aug. 25, 2006, at 1, 5; see Textron's Br. filed Aug. 25, 2006, at 2-4. Moreover, they maintain that the USCG improperly and unfairly evaluated their RB-M proposals by applying an unstated solicitation requirement to their proposed RB-Ms, and by unevenly evaluating their vessels in a manner that favored Marinette. Finally, plaintiffs argue that the USCG's best value determination was irrational.

A.   The USCG took adequate corrective action

1. Textron-EDO Teaming Agreement/ISM Issue

The Phase II Solicitation called for proposals regarding the Integrated Systems Model ("ISM"). AR 00990. The ISM is a group of multi-dimensional relational databases used to track and manage all design changes, maintenance, spare parts acquisition, and other support needs for the RB-M, which include a full-time, onsite Information Technology integrator. The ISM is listed in the Phase II Solicitation as a required element of the Systems Engineering and Support Non-Price Areas. 5/ AR 00990, 00992.

On May 20, 2005, Textron and EDO entered into a "USCG Response Boat - Medium Teaming Agreement" (the "Teaming Agreement"), by which EDO agreed to work as an exclusive subcontractor to Textron regarding certain areas of responsibility. PX (Textron) 10 at 1. These areas of responsibility included the requirement that "EDO shall offer [Textron] its advice and aid, and shall prepare the substantive content of its areas of the proposal." Id. Exhibit A to the Teaming Agreement, which tentatively establishes the "spheres of endeavor and responsibility of each party," states that EDO's responsibilities

---

5/ Section L.13.4.1.9 of the Phase II Solicitation requires offerors to "[e]xplain how the ISM will be developed, deployed, maintained, and integrated with Coast Guard systems." AR 00990. Section L.13.6.2 of the Phase II Solicitation requires offerors to "[d]escribe plans for deploying data collection capabilities and training personnel in its use. Address how these programs will be used to refine the RB-M design, . . . and their integration with the ISM." AR 00992.

include "[d]esign and implementation of the Integrated System Model (ISM)." Id. at 2, 11. In accordance with the Teaming Agreement, Textron's initial Phase II proposal designated EDO as its ISM teaming member and included information regarding the ISM as developed by EDO.  Marinette's and O-Tech's initial Phase II proposals identified Chand L.L.C. ("Chand") as their ISM teaming member.  AR 70153-77, 30034.

On November 7, 2005, following the submission of the initial Phase II proposals, the USCG decided to exclude the Textron-EDO and O-Tech teams from the competitive range, because the contracting officer for the RB-M project determined that their proposals contained "deficiencies for which correction would require a major revision or redirection of their respective proposals." AR 71829.  After being excluded from the competitive range, O-Tech filed its first bid protest action with the court. Ocean Tech. Services, Inc. v. United States, No. 06-151C (Fed. Cl. Feb. 28, 2006).  Textron also filed a complaint and notice of related case, Textron, Inc. v. United States, No. 06-161C (Fed. Cl. Mar. 2, 2006), which was consolidated with No. 06-151C.  The complaint alleged, inter alia, that, following Textron's elimination, (1) Marinette teamed with EDO on a revision of its ISM proposal between November 22, 2005, and December 13, 2005, in violation of the Teaming Agreement and (2) the USCG had directed Marinette to contact EDO which would constitute a violation of procurement regulations.

Following initial argument on plaintiffs' motions for preliminary injunction, on March 16, 2006, the USCG voluntarily agreed to take corrective action.  See Ocean Tech. Services, Nos. 06-151C & 06-161C, at 1 (Fed. Cl. Mar. 16, 2006) (the "March 16 Order").  The court retained jurisdiction to permit the USCG to "investigate and analyze the allegations of Textron's counsel" that the USCG had directed Marinette to "contact EDO, which would constitute a gross impropriety . . . , thereby causing Textron to lose a significant competitive advantage in respect of its Integrated Systems Model."  See March 16 Order at 2.

On May 17, 2006, defendant advised that the "Government has concluded that this information does not indicate a violation of the procurement laws occurred here.  This information does not substantiate that someone in the Coast Guard leaked sensitive procurement information." Def.'s Status Report, Nos. 06-1151C & 06-161C, filed May 17, 2006, at 2. Defendant also reported that the USCG "has included both plaintiffs, Textron and O-Tech, in the competitive range, and conducted discussions, in good faith, with O-Tech, Textron, and MMC . . . .  and the [USCG] anticipates that it will award a contract to one of the offerors based upon its evaluation of the FPRs." Id. at 3-4.  Subsequently, the court dismissed the pre-award bid protest pursuant to an order dated May 18, 2006.  See Ocean Tech. Services, Nos. 06-151C & 06-161C, at 2 (Fed. Cl. May 18, 2006) (order directing entry of judgment). On June 5, 2006, Textron submitted a Status Report, filed by leave of court, making its record that defendant failed to "assess the exclusivity of Textron's teaming

agreement with EDO" and stating that "[d]efendant did not accomplish this objective, as directed by the Court, and Textron reserves its right to protest based on this issue in the future." Textron's Status Report, Nos. 06-151C & 06-161C, filed June 5, 2006, at 2. 6/

Marinette, sometime between the dismissal of the pre-award bid protest and the submission of the FPRs, teamed with EDO to revise its ISM proposal before submitting its FPR. Marinette submitted a FPR that included ISM materials that were generated using EDO's assistance. Subsequently, Textron filed its second bid protest in the Court of Federal Claims on July 13, 2006, alleging (1) that the USCG failed to take appropriate corrective action following dismissal of the pre-award bid protest on May 22, 2006; and (2) the USCG interfered with the Textron-EDO exclusive Teaming Agreement by allowing sensitive procurement information to be disclosed. Textron requested injunctive relief in the form of (1) reinstatement of Textron into the competitive range; (2) an injunction prohibiting the USCG from making an award to Marinette; and (3) an award of attorneys' fees and costs.

### 1) Corrective Action

Textron argues that the corrective action taken by the USCG, after readmitting Textron and O-Tech into the competitive range, failed to redress the harm caused by the USCG's improper exclusion of Textron from the competitive range. Specifically, Textron contends that the USCG failed to discount Marinette's reliance on EDO in its FPR, even though the USCG was aware that Textron and EDO had entered into an exclusive Teaming Agreement. By failing "to [sic] inform Marinette that it would not receive any credit if it relied on EDO or information provided by EDO in Marinette's subsequent proposal," Textron's Br. filed Aug. 25, 2006, at 3, Textron argues that the USCG failed to take appropriate voluntary corrective action in effectuating Textron's reinstatement into the competitive range. Textron argues that the USCG's action was flawed because (1) the USCG's voluntary corrective action was insufficient in addressing the terms of the March 16 Order; and (2) the exclusivity of the Teaming Agreement was made known to the USCG and defendant after the first pre-award bid protest, so defendant was bound to take this into account when undertaking voluntary corrective action. Textron cites these failures as an abuse of discretion, actions without a reasonable basis, and a violation of applicable procurement rules and regulations.

---

6/   Textron's reply brief argues that it filed its response to Defendant's Status Report on May 22, 2006. Textron's Br. (Def.) filed Oct. 10, 2006, at 24. The court notes that this argument is not entirely accurate. Although Textron's Status Report was served on May 22, 2006, it was not filed until June 5, 2006, by leave of the court. Textron's Status Report, Nos. 06-151C & 06-161C, filed June 5, 2006.

The Court of Federal Claims has jurisdiction to review the propriety of corrective actions made subsequent to a pre-award bid protest.  See ManTech Telecommunications & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 65 n.13 (2001), aff'd, 30 Fed. App'x 995 (Fed. Cir. Mar. 18, 2002) (reviewing proposed corrective action for improprieties); see also 28 U.S.C. § 1491(b)(1).

Textron argues that the USCG's voluntary corrective action was insufficient to address the terms of the March 16 Order by which the court dismissed the case, retaining limited jurisdiction to monitor the USCG's investigation of Textron's allegations of impropriety.  Textron insists that the "USCG was required to take reasonable corrective action to resolve the harm caused by its corrective action."  Textron's Br. filed Aug. 25, 2006, at 10-11.  The  language of the order deflates this assertion, as it provides that defendant "intends to take corrective action by reopening discussions with the three remaining offerors as to their technical proposals."  March 16 Order at 1.  Contrary to Textron's argument, the March 16 Order states that the USCG merely would "take corrective action by reopening discussions with the three remaining offerors as to their technical proposals."  Id. at 1.

Textron also argues that the exclusivity of the Teaming Agreement was made known to the USCG subsequent to the first pre-award bid protest and that the USCG was bound to take this into account when undertaking voluntary corrective action.  Based on a failure to expurgate from Marinette's Phase II proposal any technical assistance that EDO provided to Marinette, Textron indicts the evaluation of its FPR as inflicting a competitive disadvantage.  The March 16 Order required that the USCG  "analyze and investigate the allegations of Textron's counsel," which entailed review of the Teaming Agreement.  March 16 Order at 2.  Thus, the USCG was provided notice of the existing Teaming Agreement prior to the voluntary corrective action.

Textron's argument first relies upon the exclusivity of the Teaming Agreement between Textron and EDO, which was entered into on May 20, 2005.  The Teaming Agreement includes an exclusivity provision at section 7.1, which reflects the parties' agreement "not [to] actively participate in other team efforts that are competitive to this Agreement nor compete independently for work covered by the Program during the term of this Agreement."  PX (Textron) 10 at 6.  The Teaming Agreement also provides for the termination of the agreement in section 5.1(b) upon "[n]otice that the EDO/[Textron] team has been eliminated from consideration for award of a contract for any solicitation issued for the Program."  Id.  Should the Teaming Agreement be subject to termination, section 5.2 further states:  "[E]ither party shall be free to pursue its individual technical approaches in association with the successful contractor or a third party."  Id.  Thus, while the terms of the Teaming Agreement establish that Textron and EDO at one time committed to be exclusive

partners, the exclusive agreement terminated upon notice of elimination of the Textron-EDO team from consideration. 7/ The Teaming Agreement did not address what effect, if any, a bid protest action or readmission to competitive range would have on the Teaming Agreement.

To further complicate matters, Textron has submitted evidence that EDO voluntarily recommitted itself on two occasions to maintaining exclusivity with Textron by virtue of its correspondence. On January 10, 2006, Gary Nelson, General Manager of EDO, sent an e-mail to Charles Bongard, Director of Contracts for Textron, stating:

> EDO Professional Services will honor all terms and conditions of Textron's teaming agreement of May 26, 2005 . . . , should the Government Accounting Office (GAO) decide in favor of Textron's protest.  Absent a successful protest, the termination clause in paragraph 5.1 of the Teaming Agreement shall be enforced.

AR 90626.  Second, in a letter dated March 29, 2006, Michael Sepelyak, Director of Contracts for EDO, made a similar statement to Mr. Bongard at Textron regarding the exclusivity of the teaming agreement:

> EDO is pleased to commit to an exclusive arrangement with Textron for the US Coast Guard RB-M proposal and will provide to Textron ILS and ISM support services . . . .   Additionally, EDO has no other formal teaming relationship with any of the other competitors for this proposal and will refrain from providing any informal assistance to those competitors during the proposal process.

AR 90628.

---

7/ While the court disagrees with Marinette's argument that the Teaming Agreement was an unenforceable contract, the court finds that the Teaming Agreement terminated when the USCG eliminated Textron from the competitive range.  See FAR 9.602(a)(2) (acknowledging desirability of teaming agreements); see ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 666 (3d Cir. 1998) (holding that teaming agreements are enforceable when parties can demonstrate "(1) the intent of the parties to enter into a binding contractual relationship; and (2) the existence of sufficiently objective criteria to enforce").

Textron reasons that its improper exclusion by the USCG was unforeseeable and that Textron justifiably assumed that the USCG would not improperly exclude Textron from the competitive range. Textron does not view itself as obligated to anticipate the USCG's improper exclusion, and thus "Marinette's ability to access EDO was the result of [the] USCG's improper actions, not of a[n] inadequately drafted teaming agreement." Textron's Br. filed Aug. 25, 2006, at 11. To support this novel proposition, Textron has cited to decisions involving protests before the GAO which state that offerors are not obligated to act "in anticipation of improper actions by the contracting agency," In re Mine Safety Appliances Co., B-233052, 89-1 CPD ¶ 127, and that offerors "may presume that the agency will act properly." In re Am. Multi Media, Inc., B-293782.2, 2004 CPD ¶ 158; see also In re Haworth Inc., B-256702, 94-2 CPD ¶ 98; In re Abbott GmbH Diagnostika B-241513, 91-1 CPD ¶ 139; In re Tamper Corp., B-235366.2, 89-2 CPD ¶ 79; In re Dock Express Contractors, Inc. B-227865.3, 88-1 CPD ¶ 23. These cases relate to the filing of a defensive bid protest in anticipation of an improper action when an offeror has received some form of informal or formal notification. Therefore, they are not germane to the issue of whether the Teaming Agreement defines the parties' legal commitments irrespective of subsequent dealings, assuming that the USCG knew, or should have known, about them. While the cited GAO decisions provide support for Textron's ability to challenge improper agency action that ignored the Teaming Agreement or EDO's subsequent recommitment to Textron, they do not advance Textron's argument that the USCG acted contrary to either interest.

Textron nonetheless contends that the USCG was required to neutralize the competitive advantage that Marinette gained from teaming with EDO because it was the result of improper agency action, citing to other GAO decisions. See, e.g., In re Ford Aerospace Corp., B-239676, 91-1 CPD ¶ 260; In re Minotaur Eng'g, B-259326, 95-1 CPD ¶ 157; In re Smith & Wesson, B-232681, 89-1 CPD ¶ 134; In re Computer Sciences Corp., B-190632, 79-2 CPD ¶ 102. Each of the cited decisions is distinguishable from Textron's, as each involves a finding or admission of direct prejudice as a result of agency action. See Burroughs, 617 F.2d at 596-97 (discussing the non-binding nature of Comptroller General decisions). For example, in Ford Aerospace, B-239676, 91-1 CPD ¶ 260, a prior GAO protest decision required the Department of the Navy to reissue a request for proposals due to improprieties in the evaluation of initial proposals. The Navy imposed a $13.1 million penalty on all offerors other than the initial proposal awardee, which substantially and directly prejudiced all other offerors. Id. In Smith & Wesson, B-232681, 89-1 CPD ¶ 134, the Army intended to add "generic" and other costs to each of the offerors except for the incumbent entity after the Army had been ordered to issue a new RFP as the result of a prior protest. The GAO found that assigning the additional costs to all non-incumbent offerors was improper because it was a direct competitive disadvantage imposed by the Army. Id. at *4, *8. The GAO therefore required the Army to amend the solicitation to "omit 'generic' and other costs from the evaluation of price proposals." Id.

In contrast to <u>Smith & Wesson</u>, B-232681, 89-1 CPD ¶ 134, the USCG reinstated Textron into the competitive range pursuant to a voluntary correction, not in response to a finding of improper action. Any injury inflicted upon Textron occurred because of EDO's actions, not because of any action on the part of the USCG. While the USCG may have been made aware of the nature of the Teaming Agreement, Textron did not demonstrate that Textron was harmed as a direct result of action by the USCG. <u>8/</u>

2) <u>Potential disclosure of source selection information</u>

Between March 16, 2006, and May 18, 2006, the court retained jurisdiction to investigate allegations that the USCG had disclosed proprietary information, ordering the USCG to investigate whether it had "directed [Marinette] to contact EDO, which would constitute a gross impropriety." March 16 Order at 2. Cmdr. Jerry Doherty, currently Commanding Officer of the RB-M Project Resident Office, became aware of a rumor that "Textron believed the identity of its ISM subcontractor had been divulged to Marinette." Decl. of Cmdr. Jerry Doherty, Oct. 16, 2006, ¶ 3. <u>9/</u>

> Because of the seriousness of the subject of the rumor [Cmdr. Doherty] initiated and conducted an informal investigation into whether there was any basis for the rumor. [Cmdr. Doherty] conducted this informal investigation by briefly meeting and talking with those key members of the SEB [Solicitation Evaluation Board] organization who would have been privy to the subject information. Based upon this informal investigation, [Cmdr. Doherty] concluded that there was no evidence to support the rumor.

---

<u>8/</u>  The Teaming Agreement itself provides for the exclusive avenue of relief in the Massachusetts judicial system. Section 9 of the Teaming Agreement reads: "Any disputes arising under this Agreement that are unable to be settled by the parties pursuant to the above procedure shall be resolved in a court of appropriate jurisdiction located in the State of Massachusetts." PX (Textron) 10 at 6. If the USCG had interfered with the Textron-EDO relationship by allowing Marinette to propose based on EDO's assistance, in contravention of the provision of the Teaming Agreement, Textron's argument that the USCG acted arbitrarily by intentionally interfering with a contractual relationship would be stronger. <u>See</u> <u>Gregory Lumber Co. v. United States</u>, 9 Cl. Ct. 503, 518 (1986) (cited with approval in <u>Jireh Consulting Inc., v. United States</u>, 167 F. App'x 179 (Fed. Cir. 2006) (unpubl.).

<u>9/</u>  From May 2002 to December 2005, Cmdr. Doherty was the Deputy Project Manager for the RB-M Project, and from May 2002 through the present he has been an advisor to the Proposal Evaluation and Analysis Group. Doherty Decl. at 1.

Doherty Decl. ¶ 3.  After the court ordered Textron and defendant to investigate allegations of impropriety and charged both with the task of making a formal investigation, the RB-M team met to discuss Textron's assertions.  Doherty Decl. ¶ 4.  At this meeting Cmdr. Doherty was "appointed to pursue an investigation pursuant to the PEP Security Plan, to determine if further action was necessary." Id.

> On March 24, 2006, [Cmdr. Doherty] sent an e-mail . . . to RB-M Team members (present and past), outlining Textron's allegation and requesting that each member contact [Cmdr. Doherty] about whether they had any information that would shed light on this serious allegation. [Cmdr. Doherty] also met with those RB-M Team members and ex-team members who would most likely be able to assist in identifying any unauthorized disclosure of source selection information.

Id. ¶ 5.  As a result of this investigation, on May 17, 2006, defendant reported that "information does not substantiate that someone in the Coast Guard leaked sensitive procurement information, such as the identity of Textron's ISM subcontractor, EDO." Def.'s Status Report, Nos. 06-151C & 06-161C, filed May 17, 2006, at 2.  The investigation disclosed indications that EDO was seeking information on how it performed in the RB-M evaluation:

> In one specific case, Ms. Wroton advised [Cmdr. Doherty] that she had been approached by EDO representatives in an attempt to obtain information on how well EDO had fared regarding the evaluation of Textron's ISM proposal, and Ms. Wroton had appropriately explained to EDO that the terms of her Non-Disclosure agreement prohibited her from giving any evaluation information whatsoever.

Doherty Decl. ¶ 5.

Significantly, the March 16 Order directed the USCG to "investigate and analyze the allegations of Textron's counsel," while Textron was ordered to make available "all individuals, including those from EDO and the Coast Guard, with personal knowledge of the allegations related by Textron's counsel . . . for one joint in-person interview with counsel and representatives of [O-Tech], Marinette, the [USCG], and the Department of Justice." March 16 Order ¶¶ 3, 3.2.  The court also indicated that subpoenas would be issued "upon request." Id. ¶ 3.2.

According to defendant's May 12, 2006 Status Report, after the March 16 Order was entered, Textron identified employees of EDO that it wanted to interview. Def.'s Status Report, Nos. 06-151C & 06-161C, filed May 17, 2006, at 1-2.

On March 20, 2006, a telephone conference was held which involved attorneys for the Government, Textron, [O-Tech], [Marinette], and EDO.  During the conference, EDO's attorney represented what the EDO employees who had been identified by Textron's attorney, would say if they were interviewed with regard to this matter.  Following this conference, Textron's counsel indicated that he wanted to proceed with the interviews, and the interviews were scheduled for April 3, 2006.  However, on March 30, 2006, Textron's counsel cancelled the interview.

Id. at 2.  Textron has not disputed these statements.  According to Marinette's counsel, an e-mail dated November 22, 2005 (the "November 22 e-mail"), was read to counsel in the March 20, 2006, conference call evidencing that EDO had contacted Marinette, not vice versa.  The e-mail in question was sent from Craig A. Proulx of EDO to Al Bernard at Marinette on Tuesday, November 22, 2005, at 5:30 p.m. and states:

Al,
A very good friend, Eric Midboe gave me your e-mail address.  I am trying to contact the correct person at Marinette about the USCG RBM Program.  I was the person who developed and wrote the ILS section of the RBM proposal for Textron Marine.  I also fulfilled the Integrated Systems Model (ISM) portion of their proposal.  The company I work for (EDO Corporation) developed a Life-cycle Logistics management information system (24/7 web portal) that meets all of the ISM requirements of the USCG RBM RFP.  I have left a message with Stain Laired about this.  I also found out that we were the only company that passed the RBM ILS and ISM requirements.  EDO would like to speak with you about assisting you with your ISM requirements.  The system we have is called Logistics Engineering Management System (LEMS).  See attached file.  It fulfills every one of the RBM ISM requirements.  We would like to demonstrate that fact to you.  Thank you,

Craig A Proulx
EDO Corporation
703 824-4605 w
703 216-4974 c

PX (Textron) 34 (The November 22 e-mail was added to the administrative record on September 21, 2006). Textron maintains that it only became aware of the text of this e-mail on September 15, 2006, when Marinette filed a motion to supplement the administrative record with the November 22 e-mail and, therefore, could not have investigated it before the court dismissed the earlier protest. According to Textron, the e-mail supports an inference that the USCG allowed sensitive procurement information to be leaked to EDO personnel.

To succeed in its argument that the USCG improperly disclosed sensitive procurement information, Textron faces a high burden. The Government is presumed to act without bad faith. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002). The standard for demonstrating "well-nigh irrefragable proof" is high, as it refers to "evidence 'that cannot be refuted or disproved." Id. at 1240; see also Galen Med., 369 F.3d at 1331.

> As with the clear and convincing standard, the requirement of "well-nigh irrefragable proof" also sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith: In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated to evidence of some specific intent to injure the plaintiff.

Am-Pro Protective Agency, 281 F.3d at 1240; see also Knotts v. United States, 128 Ct. Cl. 489 (1954).

Textron has failed to meet this burden. The court gave Textron leave to conduct interviews with Marinette and EDO personnel. See March 16 Order ¶ 2. Textron scheduled interviews with these individuals, only to cancel them days later. See Def.'s Status Report, Nos. 06-151C & 06-161C, filed May 17, 2006, at 2. Now Textron argues that the USCG's corrective action and investigation were inadequate, asking the court's leave to pursue another investigation or to grant a permanent injunction, even though Textron failed to avail itself of the opportunity earlier. Counsel for Textron argues that it was reasonable to cancel the interviews that it had scheduled and terminate its initial investigation into the matter for three reasons:

> Number one, I had EDO's counsel's representation that EDO was mistaken. I had Marinette's counsel's representation that EDO was mistaken . . . and that Marinette had never received the identity of EDO from Defendant which was what we though was the issue at the time. I had Marinette's counsel's representation that in fact Marinette did not contact EDO. That it was the other way around. And finally . . .[Counsel for Marinette] provide[d] a copy of the [November 22] email, . . . to [Counsel for the USCG]. [Counsel for the

USCG] reviewed the email, and I had his representation that he saw no evidence of any procurement violation.

Transcript of Proceedings, <u>Textron, Inc. v. United States</u>, No. 06-517C & <u>Ocean Tech. Services, Inc. v. United States</u>, No. 06-523C, at 129 (Fed. Cl. Oct. 24, 2006) ("Tr.").

The court disagrees, finding that Textron had leave to conduct interviews with Marinette and EDO personnel as well as subpoena power, but that Textron elected to accept the word of counsel for EDO. This was not reasonable given the circumstances. Even assuming that Textron did not have access to the November 22 e-mail until September 21, 2006, Textron had sufficient information at its disposal that further investigation into the matter would have been reasonable. In addition to the rumors and statements from EDO that persuaded the court to order the USCG and Textron to investigate the allegations initially, Textron also had in its possession a handwritten memo that should have led it to follow through with its concerns more proactively. <u>10</u>/ When the court authorized the investigation, Textron was aware that sensitive procurement information may have been released improperly. Textron had the opportunity to determine whether sensitive information was released to EDO or Marinette in violation of procurement regulations, or whether EDO's statements regarding their ISM system ranking amounted to a mistake or "sales pitch," as defendant and Marinette argue. Def.'s Br. (Textron) filed Oct. 16, 2006, at 18.

The USCG investigated the allegations of impropriety and determined that the "information does not indicate a violation of the procurement laws occurred." Def.'s Status Report filed May 17, 2006, at 2. Although the court finds that the USCG could have conducted a more aggressive, in-depth investigation, Cmdr. Doherty did uncover that EDO had approached Ms. Wroton seeking sensitive procurement information. Doherty Decl. ¶ 5. The USCG had measures in place to prevent the type of disclosure EDO was seeking when it approached Ms. Wroton, including conflict of interest/non-disclosure forms that all

---

<u>10</u>/ Textron had in its possession a telephone memorandum of an unnamed Textron employee dated November 18, 2005, stating:

   Wed Evening – Rec'd call from Marinette Marine (senior Person Resp. For RBM Proposal)
   "Little Birdies" told them Textron's ILS ISM section is the <u>only</u> proposal that passed all reviews – Want EDO to help them w/ISM. They have already called them and are looking for help.

Tr. Ex. B.

members of the RB-M team were required to sign.  Tr. at 169-70.  The USCG placed significant weight on the non-disclosure forms, and the court cannot find that it was unreasonable for it to do so.

The only inference that can be drawn from the e-mail, to which Textron argues that it did not have access to during the pre-award bid protest, is that EDO was seeking information about its ISM program, and in the process EDO discovered or inferred some correct and some incorrect information. 11/ This is not enough to overcome the presumption that the Government does not act in bad faith.  Am-Pro Protective Agency, 281 F.3d at 1240.

The court agrees with defendant that if Textron wanted to challenge the corrective action or the adequacy of the investigation, several options were presented: (1) object to the corrective action prior to dismissal of the earlier protest; (2) file a motion for reconsideration; (3) file an appeal of judgement in the prior protest; or (4) file a new timely protest.  See Def.'s Br. (Textron) filed Oct. 16, 2006, at 5.  As Textron did not take any action, it "acquiesced in that result" and failed to raise the issue in a timely manner.  Id. at 20.  It is apparent that Textron had reservations about the adequacy of the investigation even at that time, since it filed its own Status Report on June 5, 2006, but at the same time did not investigate fully when given an opportunity.  Accordingly, the court finds that Textron has waived its right to pursue the issue in this bid protest.

B.  Technical evaluation of offerors' RB-Ms

On July 5, 2005, the USCG issued the PEP describing the evaluation process and procedures for reviewing Marinette's, Textron's, and O-Tech's Phase II proposals.  AR 00600.  The Source Selection Organization (the "SSO"), the body responsible for procuring the RB-Ms for the USCG, consisted of four "organizational levels": (1) the Source Selection Authority (the "SSA"); (2) the Competitive Acquisition Management Panel (the "CAMP");

---

11/  The court concurs with Cmdr. Doherty that the November 22 e-mail contains several inaccuracies: (1) "The NPET [Non-Price Evaluation Team] did not rate subcontractors on the ISM element of the Systems Engineering subfactor," Doherty Decl. ¶ 6.a.; (2) "The NPET did not use a 'pass or fail' rating approach.  Textron actually received a 'Strength' for the ISM element, not a 'pass,'" Doherty Decl. ¶ 6.b.; (3) "Using Mr. Proulx's terminology, both Marinette and [O-Tech] 'passed' the RB-M ILS requirements" because neither received a disqualifying rating. Doherty Decl. ¶ 6.c.  Mr. Proulx was correct, however, in stating "The company I work for (EDO Corporation) developed a Life-cycle Logistics management information system (24/7 web portal) that meets all of the ISM requirements of the USCG RBM RFP."  PX (Textron) 34.

24

(3) the Source Evaluation Board (the "SEB"); and (4) the Proposal Evaluation and Analysis Group (the "PEAG"), which includes the Non-Price Evaluation Team (the "NPET") and the Price Evaluation Team (the "PET").  Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002).  AR 00602.  The PEAG Co-Chairs were the "conduit between the SEB and evaluation teams when such transmittal [was] proper."  AR 00603.

In accordance with section M.4 of the Phase II Solicitation and section D of the PEP, all offeror's proposals were evaluated in four technical areas: (1) management; (2) systems engineering; (3) mission effectiveness; and (4) support.  AR 00999, 00603-04.  The PEP directed the NPET to evaluate each proposal based on its individual merit and to "[c]onsider the portion of the proposal that relates directly to the factor or subfactor being evaluated, but [] not [to] limit review to that section only.  [And to] [c]onsider all information provided in the proposal . . . as well as independent research and input for consultants."  AR 00619.  The four Non-Price factors were evaluated based on the following subsections:

| Factor | Elements |
|---|---|
| 1. Management | a) Organization<br>b) Production Capability and Facilities<br>c) Planning and Scheduling<br>d) Production Labor Force |
| 2. Systems Engineering | a) Integrated Systems Approach<br>b) Technical Capability<br>c) Human Engineering Design<br>d) Reliability and Supportability<br>e) Maintainability<br>f) Design for Lowest Life Cycle Cost<br>g) Testing and Validation<br>h) Configuration Management<br>I) Integrated Systems Model<br>j) Risk Management |
| 3. Mission Effectiveness | a) Mission Capability<br>b) Performance [Range] 12/<br>c) Construction<br>d) Systems and Equipment |

---

12/ Performance includes the subfactors of speed, range, maneuvering, and seakeeping.  See Solicitation § L.13.5.6, AR 00991.

| 4. Support | a) Interim Contractor Logistics Support (ICLS)<br>b) Data Tracking<br>c) Field Support |
|---|---|

AR 00618

The PEP directed each NPET member to evaluate independently each proposal before meeting other team members.  AR 00619-21.  Section J instructed evaluators first to identify and document each proposal's strengths, weaknesses, significant weaknesses, deficiencies, and ambiguities.  AR 00619.  After exploring these factors, the evaluators were required to identify, evaluate, and document the risks associated with the proposal, taking special care to "distinguish between [the] risk of unsuccessful contract performance, which would be the result of a flaw in the proposal and evaluated as a component of a weakness or significant weakness, and the risk associated with the evaluator's confidence in an offeror's ability to successfully perform the technical effort described."  AR 00620.  Subsequent to individual evaluations, the NPET team members were directed to "generate a consolidated list of strengths, weaknesses, deficiencies and risks for each proposal based on team consensus."  AR 00621.  From this consolidated list, the NPET was to reach "a consensus of each proposal's merits and risks . . . and assign both a technical and risk rating [for each evaluation factor]."  AR 00621.

Section E of Appendix Three defines the important evaluation terms, as follows:  (1) A "strength" is "[a]n element of the proposal that exceeds a requirement of the solicitation in a way that is beneficial to the Government;" (2) a "weakness" is "[a] flaw in the proposal that increases the risk of unsuccessful contract performance;" (3) a "significant weakness" is "[a] flaw in the proposal that appreciably increases the risk of unsuccessful contract performance;" (4) a "deficiency" is "[a] material failure of the proposal to meet a requirement or a combination of significant weaknesses that increase the risk of unsuccessful performance to an unacceptable level;" (5) a "risk" is "[t]he evaluator's confidence in an offeror's ability to successfully perform the technical effort described in its proposal."  AR 00616.

In addition to the general evaluation terms defined above, each technical factor was assigned a "technical rating" of either "blue" (superior), "green" (satisfactory), "yellow" (marginal), or "red" (unsatisfactory).  AR 00617.  The PEP defines these terms, as follows:

26

| Color Code | Adjectival Rating | Definition |
|---|---|---|
| **Blue** | **Superior** | Exceeds the requirements in a way which yields significant benefits to the Government; weaknesses, if any, are of small impact and NO significant weaknesses or deficiencies. |
| **Green** | **Satisfactory** | Meets all requirements; proposal offers no significant benefits beyond the stated requirements yet NO significant weaknesses or deficiencies exist. |
| **Yellow** | **Marginal** | Fails to meet minimum requirements or has one or more significant weaknesses. Deficiencies and significant weaknesses are correctable without major revisions to the proposal. |
| **Red** | **Unsatisfactory** | Fails to meet the requirement; one or more deficiencies for which correction would require a major revision or redirection of the proposal. |

AR 00617.

Finally, each technical proposal was assigned a risk rating of either "High," "Moderate," or "Low." E.g., AR 40756; 00617. The PEP defines the risk ratings, as follows:

| Risk Level | Definition |
|---|---|
| High (H) | The proposed approach is likely to cause significant disruption of schedule, increase in cost, or degradation of performance even with special contractor emphasis and close government monitoring. |
| Moderate (M) | The proposed approach can potentially cause some disruption of schedule, increase in cost, or degradation of performance. However, special contractor emphasis and close government monitoring will probably be able to overcome difficulties. |
| Low (L) | The proposed approach has little potential to cause disruption of schedule, increase in cost, or degradation of performance. Normal contractor effort and normal government monitoring will probably be able to overcome difficulties. |

AR 00617.

27

The court must accord an agency's technical evaluation great deference.  As the Federal Circuit cautioned in E.W. Bliss, 77 F.3d at 449, technical ratings are "minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess."  Id. at 449; see also Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard applicable here is highly deferential.").  "'In reviewing [plaintiff's] protest of the agency's technical evaluation and decision . . . we will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation.'"  CCL Serv., 48 Fed. Cl. at 120 (quoting In re Beneco Enterprises, Inc., 70 Comp. Gen. 574, 576 (1991)).

The above-discussed factors were evaluated twice in the course of the RB-M procurement—once in Phase I and once in Phase II.  Naval Sea Systems Command ("NAVSEA") performed Phase I testing of the RB-M test boats.  The purpose of these evaluations was to "objectively and subjectively evaluate the test craft to define the physical characteristics and ensure conformance to the purchasing specification."  AR 50260.  To these ends NAVSEA conducted measurements and in-water tests of RB-M prototypes manned by NAVSEA personnel.  E.g., AR 50259.  Qualitative evaluation criteria, such as seakeeping and safety, were evaluated on the basis of crew member comments after the test runs.  AR 50369.  Technical data was also compiled, both before and during test runs, to allow for quantitative analysis of factors such as range, top speed and craft weights.  E.g., AR 50107.  NAVSEA issued two Phase I test reports.

Phase II testing was conducted by CDI Corporation ("CDI").  Unlike NAVSEA, CDI did not rely on in-water tests, but calculated factors, such as range and hull performance, using technical measurements and computer models.  E.g., AR 01062.  CDI's Phase II tests calculated the effects of material changes to the prototypes proposed after NAVSEA's Phase I tests.

Plaintiffs point to errors in the USCG evaluation of Marinette's proposed RB-M that constitute irrational agency action with respect to (1) range, (2) seakeeping ability, and (3) structural integrity.  Plaintiffs also dispute USCG's technical evaluation of their proposals on seven different grounds:  (1)  Plaintiffs contend that the USCG applied an unstated solicitation requirement to their vessels; (2) Textron disputes the USCG's evaluation of its model testing; (3) Textron insists that the USCG irrationally evaluated its scale model test data; (4) Textron contends that its battery charging system was irrationally assigned a deficiency; (5) O-Tech argues that the USCG irrationally evaluated the tendency of its vessel to heel outboard; (6) O-Tech complains that the USCG irrationally and in violation of the solicitation did not allow it to submit video evidence; and (7) O-Tech argues that the USCG

irrationally evaluated its engine room access.  The merits of each of these arguments are addressed serially.

C.  Technical requirements of Marinette's proposed RB-M

1.  Range Requirement

The Phase II Solicitation requires the USCG to consider each proposed RB-M's range capabilities as part of its evaluation of the proposed RB-M's Performance.  AR 00618; AR 00991.  The Phase II Solicitation specifies that Performance is an element of the Mission Effectiveness factor, one of the four non-price areas that the SSA considered when it made its decision to award the Phase II contract to Marinette.  AR 00618; AR 00991.  The Phase II Solicitation states:  "The RB-M shall have a range such that it can operate continuously for at least 250 nautical miles [("NM")] at 30 knots starting in the Full Load Condition . . . with a 10% fuel reserve in calm water."  AR 00875.  Plaintiffs argue that the USCG was unjustified in determining that the Marinette prototype met the RB-M range requirements.  Plaintiffs insist that Marinette's range calculations were inherently flawed and the USCG's decision to rely upon them was against the great weight of testing data.  13/

Marinette's ability to meet the USCG's range requirement has been in question since Phase I.  NAVSEA conducted two sets of tests on all three offerors' Phase I test boats.  NAVSEA issued two reports on Marinette's Phase I test boat: the Response Boat–Medium (RB-M) Acceptance Report–MMC ("Marinette's Acceptance Report"), issued in July 2004 and the Marinette Marine Corp. Response Boat–Medium Performance Test Report ("Marinette's Performance Report"), issued in May 2004.  The Phase I NAVSEA tests of Marinette's Phase I test boat range capabilities 14/ were inconclusive.  NAVSEA reported two markedly different ranges for the Marinette test boat in the Full Load Condition: [    ] in Marinette's Acceptance Report, AR 50182, and [    ] in Marinette's Performance Report, AR 50116.  The accuracy and support for these range calculations were the focus of plaintiffs' attack on the USCG's determination that Marinette met the range requirement.

The [   ] figure set forth in Marinette's Acceptance Report is followed by five pages of supporting calculations, AR 50116-20; the [      ] figure in Marinette's Performance

_____

13/  While "plaintiffs" is used throughout this section, this topic has been advanced primarily by O-Tech and only seconded by Textron.

14/  During Phase I tests, NAVSEA collected fuel-burn data that were later used to determine range taking gauge readings directly measuring the RB-M's fuel consumption.  AR 50182.

Report is accompanied only by a single table of supporting data. AR 50182. During briefing it was discovered that this single table of data in Marinette's Performance Report is the underlying support for other unrelated tests conducted during NAVSEA's performance testing in Normal Operating Conditions. AR 50117. All parties agree that this data mistakenly were placed below the [    ] figure. Tr. at 51. Although no party argues that a range of [    ] can be calculated from the data provided, Tr. at 51, the parties vigorously contest the implications of this mistake.

During Phase II, CDI performed an analysis of Marinette's RB-M range predictions. Unlike NAVSEA, CDI's analysis did not utilize data gathered through in-water testing; rather, CDI examined engine specifications provided by the engine manufacturer. AR 1081-82. CDI's calculations resulted in a lower range estimate of [    ], AR 1080-83, but the relevance of this figure is disputed. 15/

Despite the earlier testing results, in its initial Phase II proposal, Marinette stated that the range of its RB-M was [    ] at 31.7 knots. 16/ AR 70217. Emphasizing its concern with Marinette's range discrepancies, the USCG assigned the label of "weakness" to Marinette's range calculations, AR 71682, and, during discussions, noted that the "independent analysis does not correspond with the proposal findings." AR 40007. In its discussion letter of March 17, 2006, the USCG directed Marinette to provide calculations to support the range figures that appear in Marinette's FPR. AR 40007.

In response to the USCG's concerns, Marinette submitted data that it compiled during additional in-water testing of its modified Phase II test boat. 17/ These data demonstrated a fuel-burn rate of [ ] gallons per hour ("g/h") at 31.7 knots, resulting in a range of [    ]. AR 401005. Explaining the range difference between the USCG's independent tests and its

---

15/ Marinette contends that because CDI relied on the manufacturer's propeller fuel consumption when calculating range, even though the RB-M engines do not utilize propellers, CDI's calculations are flawed. AR 1082; Marinette's Br. (O-Tech) filed Sept. 15, 2006, at 10. Propeller fuel consumption data reflect the amount of fuel consumed when the engine is driving a propeller. AR 20787-96.

16/ The administrative record does not contain the final unrevised proposals.

17/ While a modified version of the Phase I prototype was used for these tests, Marinette contends that its Phase I and Phase II designs were sufficiently similar to warrant the test boat's use. AR 20241. The fuel burn rate was measured at several different RPMs and speeds "by reading the instruments provided by the engine manufacturer which were located in the pilot house." Decl. of David C. Weed, Sept. 14, 2006, ¶ 6.

own, Marinette, in its response to the USCG's discussion point, noted that the application of proper trim control can result in range improvements of [          ]. Marinette submitted that, if the "[USCG's independent analysts] did not account for this fact, the difference in range values that precipitated [the rating of 'weakness'] is easily explained."  AR 401006; see *supra* note 13.  As a result of these additional data furnished by Marinette, the USCG revised Marinette's range rating by removing the label "weakness" from Marinette's prototype proposal.  AR 40193.

Plaintiffs insist that the USCG erred in removing the "weakness" label from Marinette's FPR evaluation of range.  They contend that Marinette's range calculations are flawed and that the Marinette RB-M would be unable to meet the USCG's range requirement had proper calculations been made.  Even absent the flaws in Marinette's range calculations, plaintiffs argue that the USCG improperly relied on data that conflicted with its own Phase I and Phase II test results.

Through their expert, Dr. Roderick A. Barr, President and Technical Director of Hydronautics Research, Inc., plaintiffs argue that Marinette's range calculation were understated.  See Decl. of Dr. Roderick A. Barr, Aug. 24, 2006, ¶ 2. 18/  Dr. Barr notes that, contrary to the USCG's findings, the [    ] fuel consumption rate provided by Marinette in its testing data, AR 401005, is significantly less than the engine manufacturer's specifications, which show a [    ] propeller consumption rate per engine, or a [    ] total burn rate when both engines are accounted for.  AR 20789.  See Barr Decl. ¶ 6.  Using the modified fuel consumption rate, as well as the engine manufacturer's technical data, Dr. Barr mathematically calculates a revised range for Marinette's RB-M between [  ] and [    ]—at least [  ] short of the USCG's [    ] requirement.  See Barr Decl. ¶¶ 2-3, 12-17.  Dr. Barr notes that, in addition to being mathematically correct, his conclusions are in line with the independent analysis of CDI, which used its own mathematical formulas to arrive at a similar range for the Marinette prototype.  See Barr Decl. ¶¶ 13, 17.

Dr. Barr concludes that the combination of the lower-than-realistic burn rate and the assumption of fully optimized trim—an assumption he believes is unrealistic 19/—resulted in a dramatically higher range calculation by Marinette.  See Barr Decl. ¶ 4.  He contends that the Marinette RB-M could meet the USCG's range requirement only if an extra 26 gallons of fuel capacity were added.  Barr Decl. ¶ 20.  Accommodating this additional capacity will

---

18/  Defendant and Marinette discredit this statement as unsworn.

19/  Dr. Barr finds this unrealistic because real-world mission conditions do not allow for fully optimized trim.  However, the Phase II Solicitation only requires a range of 250 NM in calm waters, not necessarily mission conditions.  Solicitation § 051-1.3, AR 00875.

either require "major change[s] in hull structure" or the addition of an auxiliary tank and the accompanying pumps and gauges which would also result in "significant changes." Barr Decl. ¶¶ 20-21. In light of Dr. Barr's analysis, plaintiffs insist that Marinette's data do not accurately reflect the performance of its test boat and that the USCG acted irrationally in relying upon this information.

During oral argument O-Tech argued that the FPR data were irrelevant because they were obtained at 31.7 knots and not precisely at 30 knots. Tr. at 98-99. Either through the use of mathematical calculations, in-water tests, or a combination of the two, O-Tech, Textron, NAVSEA, and CDI—every party except Marinette—arrived at a formula by which the range, at any given speed, could be estimated. AR 30447, 30166 (O-Tech); AR 10265 (Textron); AR 50116-20 (NAVSEA); AR 01080-81 (CDI). Marinette's FPR data did not generate such a calculation. Rather, Marinette simply submitted the data that it gathered "by reading the instruments provided by the engine manufacturer which were located in the pilot house." Decl. of David C. Weed, Sept. 14, 2006, ¶ 6; see also AR 20244-45. Because the Phase II Solicitation did not stipulate a methodology for data-gathering, this court declines to find significance in a 1.7-knot difference between the speed at which data were requested and the speed at which Marinette's data were recorded.

Apart from the lack of precise measurements at 30 knots with Marinette's calculations, plaintiffs also contend that the USCG acted irrationally in relying on Marinette's range calculations. Plaintiffs suggest that the [      ] range estimate in Marinette's Acceptance Report cannot be considered persuasive because the report contains no indication of the underlying data from which the figure was calculated. If the [      ] figure is disregarded, as plaintiffs argue it should be, the only support for Marinette's claim that its RB-M can meet the 250-NM range requirement consists of: (1) the data that Marinette provided its FPR (the "FPR Data") in response to the USCG's assignment of the "weakness" label to Marinette's initial Phase II range predictions and (2) Marinette's explanation that its RB-M failed to meet the range requirement in previous tests only due to improper trim control. AR 401005-06. Plaintiffs charge that, in light of the results of the range testing that occurred throughout the procurement process, it was irrational for the USCG to rely solely on Marinette's computer-collected data in determining Marinette's RB-M's range.

Defendant and Marinette take markedly different views of the RB-M evaluation process. Essential to their arguments is the notion that the FPR Data can stand alone and that the FPR Data demonstrate that Marinette's RB-M meets the range requirement. Marinette reminds the court that the USCG was not required to rely solely upon the reports of its analysts. See Solicitation § L.12.2.4.1, AR 00985 (allowing for inclusion of test-run data). To the contrary, as part of its Phase II proposal, each offeror was required to provide "calculations or other documentation, as needed" to "fully support the proposed RB-M's

capability to conduct the required missions."  AR 00990 (quoting Phase II Solicitation § L.13.5.1).

Marinette also points to section L.13.1.3 of the Phase II Solicitation, AR 00987, which encourages potential contractors to make use of, *inter alia*, "calculations" to improve the readability of the proposals, and section L.12.2.4.1, which states that "[s]upporting documentation, including calculations, manufacturer's cut sheets, and test results, shall be provided as required," AR 00985, as further evidence that not only were supplemental calculations and outside testing proper additions to a proposal, but, once added, they constituted legitimate sources of information for the USCG evaluation teams. See Tr. at 211-15.

Defendant and Marinette emphasize that, with the exception of the contested NAVSEA range estimates, see AR 50182, the figure generated from the FPR Data was the only such calculation based on actual, computer-collected fuel burn measurements, Tr. at 57-58, as opposed to the manufacturer's "cut-sheet" data.  See Barr Decl. ¶ 8; AR 1082, AR 20787-96.  Both defendant and Marinette argue the calculations based on "cut-sheet" data, are wholly irrelevant because they do not display water-jet fuel consumption, the selected method of propulsion for the RB-Ms.  See AR 00903.  Defendant and Marinette posit that the fact that the USCG elected to grant more consideration to the FPR Data than the other data collected throughout the procurement process was a matter of discretion and does not evidence an irrational or arbitrary decision.  Tr. at 20.

Defendant and Marinette also contend that, despite plaintiffs' strong rebuttal, the data collected during Marinette's Acceptance Tests, resulting in a range calculation of [       ], are relevant.  They contend that those data conclusively demonstrate that Marinette's RB-M is capable of meeting the USCG's range requirements.  As noted above, neither Marinette nor defendant argues that the Marinette's Acceptance Report contains the underlying data and calculations to support the range estimate of [       ].  Nevertheless, defendant and Marinette reason that the lack of support for the [       ] figure does not make the estimate irrelevant.  Tr. at 49-50.  In their view the figure from Marinette's Acceptance Report is extremely reliable because, similar to the FPR Data, it was taken from direct measurements.  AR 50182; Tr. at 47-52.  Defendant and Marinette characterize the incorrect underlying data in Marinette's Acceptance Report as an oversight or mistake that does not taint the figure presented in the report.  Tr. at 51.

Marinette argues that differences between the FPR Data 20/ and plaintiffs' contentions that the Marinette test boat cannot meet the range requirement are reconcilable. According to Marinette, the [    ] figure from Marinette's Performance Report, AR 50116, is based on tests where the proper trim control was not applied. Tr. at 217. 21/ Marinette contends that the RB-M would have achieved an improvement in range of [    ] bringing the prototype's range above the 250-NM requirement. See AR 401005-06.

Marinette accounts for the discrepancy between the FPR Data and the range figures of Dr. Barr and CDI by arguing that they both committed the same error while applying the same method for determining range. Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 8. CDI and Dr. Barr calculated the range of Marinette's prototype from the RB-M's fuel consumption. Barr Decl. ¶ 9; AR 1082 (CDI). They obtained the fuel consumption data from the engine manufacturer's "cut-sheet," or engine specifications. Barr Decl. ¶ 8; AR 01082 (CDI). These specifications provided only propeller fuel consumption data—the amount of fuel consumed when the engine is driving a propeller. AR 20787-96. Dr. Barr and CDI used this data to calculate their range estimates. Barr Decl. ¶¶ 8-10; AR 01082 (CDI). Marinette makes the distinction that, in accordance with the USCG's specifications, its RB-M is propelled by water-jets, not propellers. AR 00903. "[D]ue to the potentially greater efficiency of a water-jet at theses speeds, it is quite likely that the actual fuel burn rate would be less than indicated by the manufacturer's data for 'propeller fuel consumption.'" Marinette's Br. (O-Tech) filed Sept. 15, 2006, at 10. 22/

_____

20/ While the same arguments theoretically would apply to the data issued by NAVSEA in Marinette's Acceptance Report, Marinette focuses on the FPR Data as more relevant to the USCG's final decision.

21/ Plaintiffs adamantly oppose the assertion that no trim was applied. They argue that, because the NAVSEA test procedures state that "static and dynamic trim was determined," AR 50112, some trim must have been applied to the RB-M during NAVSEA testing. Tr. at 241.

Defendant counters that, while trim tests may have been conducted, the NAVSEA test in question was conducted without trim tabs, and thus the [    ] estimated increase in range remains relevant. Tr. at 238-39.

22/ While Marinette asserts that water jets consume less fuel than propellers, the engine manufacturer provides no data for water jet propulsion. Marinette relies on its expert, George L. Petrie who states, "the engine must work harder when attached to a propeller to achieve and maintain a given RPM than it must do when attached to a water jet," and goes on to connect the harder "work" with a higher fuel consumption. Suppl. Decl. of George L.

Defendant, through its own engineering expert, David M. Shepard, PE, 23/ echoes Marinette's concerns over Dr. Barr's range calculations. Specifically, Mr. Shepard notes that direct measurement of the fuel consumption of an engine while it is powering a specific boat—the technique used by Marinette to collect its FPR Data—is a far more accurate means of obtaining the fuel consumption data required to calculate range, compared to reliance on the manufacturer's data—the method used by Dr. Barr. See Decl. of David M. Shepard, PE Oct. 16, 2006, ¶ 7. Specifically, Mr. Shepard notes the manufacturer's data "do[] not represent the actual conditions, do[] not apply to boats propelled by waterjets, and do[] not provide the most accurate means of determining fuel consumption." Shepard Decl. ¶ 11. In fact, Mr. Shepard declares, the manufacturer's data are most relevant for "heavy, slower craft" and not craft similar to the RB-M. Shepard Decl. ¶ 11. "The bottom line is that, despite Dr. Barr's concerns, [Marinette] provided a rational methodology for determining the range of its proposed RB-M, and the evaluation team reasonably and correctly found that the range met the requirements." 24/ Shepard Decl. ¶ 14.

In resolving this dispute, the big picture plays a role. If everything plaintiffs allege regarding range is correct, the court would be presented with the following scenario. The [     ] figure would be considered irrelevant, leaving the [     ] figure in Marinette's Performance Report as the only remaining range calculation from Phase I. See AR 50116. The Phase II analysis, providing the [     ] figure, AR 01080, would also remain relevant. Dr. Barr's calculations, while not revealing any new information, would bolster NAVSEA's and CDI's range calculations in both Phases of testing. Marinette replies by offering its FPR Data, as well as its explanation, as to why they differ from the other data collected and the fact that the Phase II Solicitation permitted its reliance on these data.

---

22/ (Cont'd from page 34.)

Petrie, Oct. 15, 2006, ¶ 8. O-Tech's expert challenges this point, arguing that propeller and water jet fuel consumption are roughly analogous. Suppl. Decl. of Dr. Roderick A. Barr, Oct. 9, 2006, ¶¶ 8-10.

23/ In addition to serving as a USCG expert, Mr. Shepard was co-author of the RB-M specifications and Co-Chair of the Proposal Evaluation and Advisory group.

24/ Mr. Shepard also disputes Dr. Barr's contention that, even if Marinette's RB-M was unable to meet the USCG's range requirements, major modifications would be required. Mr. Shepard opines that raising the top of the fuel take two inches would accommodate any extra fuel required. Shepard Decl. ¶ 15.

As noted earlier, in applying the arbitrary and capricious standard of review, the court's role is not to question the wisdom of the USCG. Bannum, 404 F.3d at 1351. Instead, the court may only consider whether the agency's actions lack a rational basis. Id. In the context of a negotiated procurement, this is achieved by determining whether the agency can offer "'a coherent and reasonable,'" explanation for its actions. Garufi, 238 F.3d at 1332 (quoting Saratoga Dev. Corp., 21 F.3d at 456).

Even taking the position most favorable to plaintiffs, *i.e.,* that all of their assertions regarding range are correct, the court cannot conclude that plaintiffs have met their burden of proof. The USCG was justified in asking Marinette to provide additional calculations to support its range estimate. "While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment." FAR 15.308. The court finds that the USCG considered the data submitted by Marinette that was contemplated by the Phase II Solicitation and rationally eliminated the weakness label from its evaluation of Marinette's FPR. The court finds that the USCG was justified in relying on Marinette's range predictions. The USCG's range determination is not arbitrary and capricious simply because Marinette's range estimate is greater than the range estimates submitted by NAVSEA and CDI, given he option provided by the Phase II Solicitation to submit computer-generated readings.

2. Seakeeping

Plaintiffs contend that Marinette's proposed RB-M is incapable of meeting the USCG Phase II Solicitation seakeeping and safety requirements and that the USCG erred by not disqualifying Marinette on this basis. The seakeeping requirement, contained in section 051-2.2 of the Phase II Solicitation, requires that the RB-M must be

> safe and controllable at all speeds up to the maximum attainable speed and under all specified loading conditions . . . . Safe and controllable operation shall constitute operation where craft orientation, motions and accelerations do not pose a hazard to the crew or passengers and the required course can be maintained.

AR 00875. Section 088-3.1 and 088-4.1of the Phase II Solicitation provide the safety and hazard requirements for the RB-M:

> 088-3.1 The RB-M system capability shall be such that system safety hazards associated with materiel shortcomings and impact on systems and human performance for all conditions . . . are identified and eliminated or reduced to acceptable levels through engineering design and manufacture.

> 088-4.1 The RB-M system capability shall be such that health hazards associated with, but not limited to, mechanical forces including shock and vibrations; . . .are identified and eliminated or reduced to acceptable levels.

AR 00889.

The Phase I NAVSEA crew comments reported an overall positive experience riding in Marinette's test boat.  In reporting its test boat's seakeeping ability, the NAVSEA report stated:

> Crews enjoyed the seakeeping capabilities of this boat. One crew member said, 'The boat cuts right through the sea state.'  Another said, 'it's amazing how well this boat operates in today's sea state.  Nothing in today's Coast Guard operates like this boat.'  They all felt it was very comfortable in all sea states tested.

AR 50383. Despite the positive feedback Marinette received regarding its seakeeping ability, the NAVSEA test crews noted that the ride in Marinette's test boat passenger compartment and deck could pose safety concerns.  Specifically, the NAVSEA crew comments reported:

> In any sea condition other than flat calm, the passenger compartment was very uncomfortable due to the lively ride.  Most passengers will elect to stay on deck or wedge themselves in the cabin. Passengers on deck in speeds >20kts were unsafe and ejection of passengers was a major concern.

AR 50385.

CDI Technical Memorandum #807.001-22, which evaluated Marinette's initial Phase II proposal, stated that it could not identify any changes made by Marinette to address the Phase I concerns with the uncomfortable ride quality in the passenger compartment of Marinette's test boat.  AR 01085, 01087.  The CDI report concluded its discussion of passenger compartment safety concerns by noting that

> accelerations will likely continue to be high in the passenger compartment given its forward location in the boat.

> The utilization of the interceptor system to optimize trim angle in seaway conditions can manage the severity of the ride to some degree.  However, this capability was also available on the test boat, and crew still noted the uncomfortable ride in the forward compartment and the potential for

ejection of passengers or personnel outside of the cabin while underway in rough seas.

AR 01088.

In its FPR Marinette responded to the concerns regarding the vertical acceleration measurements in the passenger compartment 25/ by stating that it would rework the cabin seating arrangement to provide for more secure handholds and "better placement of individuals occupying the space." AR 20232. It made clear, though, that the design and nature of the craft restrained it from completely eliminating the risk of passenger ejection: "Due to the craft[']s speed and maneuverability, it is possible to eject passengers from the deck at higher speeds. The [General Information Book] for the production craft will clearly address this risk, and provide instructions for mitigating this hazard." AR 20232; see also AR 20424.

Plaintiffs contend that the concerns raised in the NAVSEA crew comments and CDI evaluation about the ride in Marinette's RB-M show that Marinette's FPR does not meet the USCG's Phase II Solicitation requirements. Consequently, plaintiffs press the view that the USCG should have assigned Marinette a "red" rating, thereby disqualifying it from the competition. Specifically, O-Tech takes issue with the vertical accelerations measured during NAVSEA tests in two positions on the boat: (1) the Coxswain's Station (the helm) and (2) the Passenger Compartment. It is O-Tech's contention that vertical accelerations measured in these locations demonstrate both a significant risk of ejection and the potential for severe discomfort.

O-Tech, through its expert in naval architecture Dr. Barr maintains that vertical acceleration in the identified positions exceeds "acceptable" measurements when compared to International Standards Organization ("ISO") recommended limits. Barr Decl. ¶ 7.

> Dr. Barr found that at both the Coxswain's Position and in the Passenger Compartment, NAVSEA measurements show vertical accelerations reach the limit for severe discomfort due to seasickness in one-half hour or less. The exposure limit will be reached in one hour in the Passenger Compartment, even in moderate seas, and 2.5 hours in the Coxswain's Position.

---

25/ "Vertical acceleration" is one of the quantitative measurements chosen by the USCG to assess the ride of the RB-M.

O-Tech's Br. filed Aug. 25, 2006, at 11(citing to Barr Decl. ¶¶26-29).   Because the Coxswain's Position must be manned at all times, the vertical acceleration measured at that location is problematic, in Dr. Barr's opinion.  Id. ¶ 7.

With respect to the risk of ejection, defendant and Marinette contend that plaintiffs have overstated the examiners' concern characterizing O-Tech's assertions as "sheer hyperbole."  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 10.  Defendant notes that, at speeds greater than 20 knots, the risk of ejection is present in all small boats and that the deck of the RB-M is not intended to be a passenger area.  See Decl. of George L. Petrie, Sept. 14, 2006, ¶ 9.  Both parties also question the applicability of determinations made from NAVSEA's vertical acceleration data.  In particular, Marinette notes that "[t]hese accelerations are of extremely short duration, are typical of small craft operating at high speeds in heavy seas, and are not likely to result in ejection."  Marinette's Br. (O-Tech) filed Sept. 15, 2006, at 14. Marinette goes on to state that such accelerations are mitigated easily by "flexing the knees," Marinette's  Br. (O-Tech) filed Sept. 15, 2006, at 14, and, further, that the crew concerns over ejection were addressed in the initial Phase II proposal by the inclusion of "more secure handholds."  Id. at 16; AR 72238.   Finally, regarding Dr. Barr's specific analysis of Marinette's vertical acceleration and the risk of ejection, Marinette observes that the acceleration figures used by Dr. Barr were measured during moments of downward acceleration, i.e., when the boat makes contact with the water, and that at no point did the upward acceleration—presumably the type more likely to eject someone—ever reach such extreme levels.  Petrie Decl. ¶ 9.

In addressing O-Tech's claims concerning the discomfort experienced by individuals in the Passenger Compartment of Marinette's test boat, both defendant and Marinette respond that the Phase II Solicitation does not require that the boat be comfortable.  See AR 00875.  Defendant asserts that Marinette addressed concerns over the RB-M's comfort by "propos[ing] changes in the compartment's seating arrangement, and handholds, in its FPR." Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 10 (citing AR 20232).  Defendant further suggests that Dr. Barr's analysis is "irrelevant" to the extent that it relies on data collected from instruments attached directly to the RB-M's hull, thus not considering any beneficial effect that the boat's shock-mitigating seats might exhibit.  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 10.

Defendant further reminds the court that vertical acceleration, and the concerns raised thereby, is not an independent criterion for evaluating the RB-M.  Instead, it is one aspect of the broader evaluation of maneuvering and seakeeping, which, in this procurement, is assessed in its entirety.  AR 00991, AR 00886.  Defendant argues the court would have to (1) disregard the agency's discretionary trade-off determination, and (2) find that the entire

"maneuvering and seakeeping" evaluation hinges upon one specific characteristic, in order to sustain plaintiffs' position.  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 11.

Marinette generally echoes defendant's arguments regarding plaintiffs' position on vertical acceleration.  Marinette adds that the NAVSEA testing crews were capable of describing what they consider to be a boat that did not meet the safety and seakeeping specifications.  Marinette points to NAVSEA's evaluation of Textron's RB-M, which was described as "unsuitable for [the USCG] use due to the punishing ride" and likely to "create health problems for its occupants."  AR 50472. Marinette argues the NAVSEA crew's use of less severe language in describing Marinette's test boat indicates that the crew did not consider its lack of comfort serious enough to warrant disqualification.

It is plaintiffs' burden to demonstrate that the USCG acted irrationally by not assigning a disqualifying rating to Marinette's FPR for maneuvering and seakeeping.  Bannum, 404 F.3d at 1351.  At best, plaintiffs have shown that, had the USCG chose to weigh the individual factors of seakeeping and maneuverability differently, it might have reached a different result.  The weight attached to individual factors, however, is not for this court to determine.  To the contrary, that matter reposes within the discretion of the USCG, and, accordingly, the court defers to the USCG's exercise of its judgment.  The record demonstrates that the USCG had a rational basis for reaching its decision with respect to maneuvering and seakeeping.

### 3. Structural integrity

Textron contends that the USCG ignored a "serious structural integrity issue[]" in Marinette's proposed RB-M design.  Textron's Br. filed Aug. 25, 2006, at 4.  It disparages Marinette's choice to interrupt its structural support beam with an engine access hatch that compromises the structural integrity of Marinette's vessel.  "Had [the] USCG properly evaluated Marinette's proposal, and identified structural integrity as a concern, Marinette would have received a deficiency in the area of Construction, rendering it ineligible for award."  Id. at 4.  Textron relies on Prof. Alaa Mansour, who declares that "[t]he absence of a continuous center longitudinal girder significantly reduces the amount of material available to support the loads and stresses to which the vessel will be subjected."  Decl. of Alaa Mansour, Aug. 25, 2006, ¶ 31.  The shortage of material available for support presumably creates a danger that the vessel will lack adequate torsional stiffness, which may result in hull distortion or a concentration of stress at the corners of the engine, access hatch, or pilot house, potentially causing the deck to crack.  Mansour Decl. ¶¶ 32-34.  As a result of these alleged deficiencies, Prof. Mansour predicts that Marinette's vessel will develop fatigue cracks that will "impair the structural integrity of the Marinette design."  Id. ¶ 36.

40

The court cannot verify the accuracy of Prof. Mansour's opinions. As Marinette correctly points out, Prof. Mansour's sole support for his analysis is a vague statement declaring that he reviewed "portions of the administrative record related to the structural integrity of [Marinette's] design. In particular [Prof. Mansour] reviewed relevant portions of Marinette's proposal, as well as the structural integrity analysis conducted by CDI." Mansour Decl. ¶ 6. Prof. Mansour and Textron fail to provide any data, calculations, or other information to explain how he reached his conclusions. This lack of support frustrates the court's evaluation of Prof. Mansour's proffered evidence and cannot constitute the basis for a finding that Marinette's proposed RB-M suffered from any structural integrity deficiencies, or the basis to cite the NPET for not recognizing the purported deficiency. Plaintiffs bear the "heavy burden" of proving that the USCG acted irrationally by a preponderance of the evidence. Garufi, 238 F.3d at 1333. The court should defer to the agency's analysis so long as it has substantial basis in fact. See Fed. Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972); Camp v. Pitts, 411 U.S. 138, 142-43 (1973); In re Sang Su Lee, 277 F.3d at 1344; see also CCL Serv., 48 Fed. Cl. at 120. Textron's submission of a declaration bereft of citation or support in the administrative record does little to further its cause.

In contrast, defendant and Marinette's experts provide a detailed and methodical explanation for the USCG's analysis and decision. David C. Weed, Marinette's expert and one of the principal designers of Marinette's Phase I and Phase II RB-M, explains how Marinette's RB-M meets the Phase II Solicitation requirements. See Weed Decl. ¶¶ 4-11. Mr. Weed states, in part:

> The structural design was developed using Lloyds Register Special Service Craft Rules, an internationally accepted mature set of structural design standards. These standards are perhaps the most onerous of the main Classification Society rules when applied to this type of craft . . .

> Software provided by Lloyds is used to analyze compliance with these standards, as each component in the structural network has an impact on others. This analysis is shown in Appendix H of Marinette's proposal (Marinette Final Proposal Revision, Technical Book 2 of 4, Appendix H) . . . The RB-M overall structure can be considered both as a global and a local structure. The local structure provides the support for shell plating and resists distortion, while the global structure resists the overall loads imposed on the craft and helps resist the bending and twisting.

Weed Decl. ¶¶ 5, 7. Defendant's expert Mr. Shephard undermines Prof. Mansour's opinion regarding the need for a "continuous longitudinal girder." Mr. Shepard states that "[i]t is

very common NOT to have a continuous beam running the length of the main deck on centerline.  There are numerous examples of this in the [USCG's] own inventory of boats." Shepard Decl. ¶ 18.  Mr. Shepard then cites to three vessels without continuous longitudinal girders that have been in the USCG's fleet since 1973, 1990, and 1977, respectively.  Id. ¶ 18a-c.

Perhaps the most extraordinary aspect of Textron's position is that its own proposed RB-M has two deck hatches interrupting the longitudinal girder running the length of its deck.  See AR 12209.  If the lack of a continuous centerline were a genuine problem, as Prof. Mansour contends, then both Textron and Marinette should have been assigned disqualifying ratings.  Instead, the USCG penalized neither offeror for the interruption of the longitudinal girder.

Finally, Textron's contention that the USCG failed to evaluate Marinette's RB-M is completely without merit.  The USCG addressed the structural integrity of Marinette's vessel.  As Mr. Shepard states:

> In the case of [Marinette], their proposal provided a narrative describing [its] hull structure and indicating how it was based on the successful design used for the Test Boat [Proposal Section 4.7, AR 20248-20250] and then further supported this with drawings [Proposal Appendix K, AR 20809-20812] and calculations [Proposal Appendix H, AR 20721-20779] that show that the proposed boat fully complies with the structural requirements. [Spec 100-1, AR 00893]

> The NPET appropriately concluded that there were no significant issues with regard to the proposed structural design of [Marinette's] boat.  This was not noted in [the] NPET report since compliance with requirements does not generate a Strength, Weakness, Significant Weakness or Risk as defined by the PEP [AR 00619-00620].

Shepard Decl. ¶¶ 22-23 (record citations in original).

The evaluation of the structural integrity, although not discussed in any detail, was noted on the NPET's Evaluation Worksheet, consistent with the PEP instructions.  AR 40169.  Furthermore, Marinette's FPR indicates that significant testing was conducted by the USCG during Phase I: "Throughout the Builder trials and USCG test program, the Prototype structure exceeded all the requirements of the specification. . . . [A]part from the production driven changes there is no substantial difference between the structural design requirements of the Prototype and the production craft."  AR 20248.  Because Marinette did not make significant changes to its RB-M between Phase I and Phase II, as all parties have agreed, the USCG was justified in relying on Phase I prototype test results and other information

contained in Marinette's RB-M proposal.  Thus, the USCG satisfied its obligation to provide a "coherent and reasonable explanation" of its evaluation of Marinette's Phase II proposal. Garufi, 238 F.3d at 1332 (quoting Saratoga Dev. Corp., 21 F.3d at 456).

D.  Evaluation of plaintiffs' proposed RB-Ms

1. Unstated Solicitation Requirement

Plaintiffs assert that the USCG applied an "unstated solicitation requirement" to their respective proposals, requiring offerors to produce a full-scale prototype or submit data from the result of prototype testing, a requirement not stated in the Phase II Solicitation.  See O-Tech's Br. filed Aug. 25, 2006, at 12; Textron's Br. filed Aug. 25, 2006, at 18.  They take the position that Marinette's ability to rely on test data gave Marinette an unfair and inequitable advantage over the other offerors.

The Competition in Contracting Act, 10 U.S.C. § 2305(a)(1)(A) (2000), requires solicitations for competitive proposals to include "all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating . . . competitive proposals . . . and the relative importance assigned to those factors and subfactors." 10 U.S.C. § 2305(a)(2)(A)(I) (2000); see also, FAR 15.304(d) (restating quoted language).  "It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."  Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345; see also Alfa Laval, 175 F.3d at 1368. "It is fundamental that offerors must be advised of the bases upon which their proposals will be evaluated.  Therefore, an evaluation based on unstated minimum requirements is improper."  In re Omniplex World Serv. Corp., B-290996.2 2003 CPD ¶ 7 at *3 (citations omitted); see also In re Kumasi Ltd./Kukawa Ltd., B-247975.7, 93-1 CPD ¶ 352.

A full understanding of plaintiffs' allegations requires a detailed explication of the RB-M procurement process.  As previously discussed, during Phase I, Marinette, Textron, and O-Tech were awarded contracts to build test boats, which were tested by the USCG's Mission Effectiveness Team.  AR 00701.  Crew comments were provided from NAVSEA's in-water testing.  AR 00991.  The Phase II Solicitation, which was issued pursuant to a Justification for Other Than Full and Open Competition invited Marinette, Textron, and O-Tech to compete for the award of the Phase II contract, which included the option for production of up to 180 boats, as well as various technical and support services to be provided over a period of up to eight years.  AR 00586, AR 01663.  The Phase II Solicitation changed some of the design specifications from Phase I, including increasing the beam width from fourteen to fifteen feet.  Compare AR 5003 with 00876.  Phase II also allowed offerors to redesign their RB-Ms and to make changes based on the USCG's evaluation and crew

comments.  See AR 00991 (requiring each offeror to submit copies of Mission Effectiveness and Supportability Phase Report for its RB-M test boat and respond to every item).

Both O-Tech's and Textron's Phase I test boats manifested serious technical shortcomings that the USCG Mission Effectiveness Team identified during the Phase I evaluation.  AR 01223; see AR 30293 (O-Tech Proposal listing Phase I crew comments and its proposed changes for Phase II); AR 30297 (same); AR 50464 (Mission Effectiveness and Supportability Phase Report on Textron's Phase I test boat).  For example, Textron's Phase I Mission Effectiveness and Supportability Phase Report reflects that the USCG test teams found problems with the seakeeping ability of Textron's test boat, including a tendency to "spin out," limited visibility from the helm, noise, and access to the engine. AR 50464.  Likewise, O-Tech's prototype had difficulty meeting the Phase I Solicitation speed requirements, and the test crews reported that the vessel's hull suffered from "flexing/twisting" in choppy sea conditions.  AR 50424.

As a result of the problems identified by the test crews, both O-Tech and Textron submitted Phase II proposals that differed significantly from their Phase I prototype boats.  As CDI Technical Memorandum #807.001-4 indicates, O-Tech made changes to the overall beam and demi-hull beam, refined bow lines, and modified the propulsion system to include a new propulsion engine make/model. AR 01203.  Some of the design changes proposed in Textron's FPR included "[r]evising the hull shape for improved seakeeping and ride quality; [e]nlarging the deckhouse for improved human factors and self-righting buoyancy; [a]ccommodating weight growth for improvements such as additional insulation for noise reduction, the Series 60 Engines, and heavier bottom plating."  AR 10213.

The Phase II Solicitation did not require offerors to build a full-scale test boat or submit data from a full-scale prototype, although section M.4.3 of the Phase II Solicitation informed offerors that the USCG would evaluate all of the information provided in their proposals.  "When conducting the evaluations, the Government will consider data provided by the Offeror in the proposal.  The evaluation of all factors will also assess the risk associated with the proposal."  AR 01000 (emphasis added).  Section L.12.1.6 of the Phase II Solicitation required offerors to produce a paper proposal including "convincing documentary evidence" relating to any promise of performance.  AR 00983.  Offerors were required to include the Mission Effectiveness and Performance Test Reports from the in-water testing of the Phase I prototype and to discuss, as part of their FPR proposals, any deficiencies or weaknesses discovered in the earlier rounds of prototype testing.  AR 00991.  The USCG encouraged offerors to "make reference to the results of the Test Boat evaluations [and] [p]rovide calculations or other documentation, as needed, to support the narrative." AR 00990.

As part of the evaluation process, the USCG verified the reliability and accuracy of the information that each offeror presented in support of its proposal. Defendant evaluated Marinette's, O-Tech's, and Textron's testing methods and concluded that plaintiffs' testing methods were not convincing. In contrast, in its decision letter dated June 21, 2006, the USCG found Marinette's proposal and supporting data persuasive. AR 40441-42. The USCG's confidence in Marinette's proposal stemmed, in part, from Marinette's ability to rely on its Phase I test boat, which was "recognized during the Prototype testing period for its superior handling, control, and sea keeping performance." AR 20224.

Both O-Tech and Textron argue that the USCG implicitly applied an unstated solicitation requirement in evaluating their proposals, because only Marinette was able to rely on its Phase I test boat. The court disagrees. As defendant argues its reply brief, Textron, O-Tech, and Marinette all had the same three options when submitting their Phase II proposals: "(1) [S]ubmit a Phase II proposal based closely on their Phase I boat; (2) submit a Phase II proposal based on a design that varied materially from their Phase I design; or (3) decline to submit a Phase II proposal." Def.'s Br. (Textron) filed Oct. 16, 2006, at 2. Marinette's choice to utilize a design that did not change substantially from its Phase I design was a predictable result of its superior performance in Phase I. In contrast, O-Tech and Textron faced a more difficult business decision in preparing their Phase II proposals because their test boats had not performed as well as Marinette's boat.

As defendant points out, "Textron could have adopted a similar approach for its Phase II design, but opted for a more substantial redesign, because serious shortcomings were identified in several important areas during the [USCG's] Phase I evaluation." Def.'s Br. (Textron) filed Sept. 22, 2006, at 20; see also Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 13 (similar but with respect to O-Tech, also stating, "O-Tech knew—or should have known—that, because of this departure from its Phase I design, it had a bigger burden when it came to convincing the [USCG] that its Phase II proposal would meet  the contract requirements").

Both plaintiffs quote selectively from the administrative record to demonstrate that the USCG somehow imposed an unstated requirement. 26/ Moreover, plaintiffs argue that

---

26/  For example, O-Tech quotes from a section of its Post-Award Debriefing, which states, in part:

> The proposal indicates hydrodynamic 'tuning' was performed on the Phase I Test Boat to improve performance, however, the significant changes to the proposed design reduce[] confidence in the applicability of the results. The significance of the changes which are not proven through previous testing indicates significant Contractor emphasis and government monitoring will be required . . . .

the USCG's evaluation of their alternative testing methods was flawed and that the USCG ignored information contained in their proposals.  Textron takes the position that the USCG improperly evaluated its model testing, and O-Tech argues that the USCG irrationally

_____

26/  (Cont'd from page 45.)

O-Tech's Br. filed Aug. 25, 2006, at 14 (quoting AR 40775) (alteration in original).  O-Tech then argues, based on this passage, that the phrase "not proven through previous testing" indicates that the USCG faulted it for not proving its design through prototype testing.  Yet, other passages within the same document explicitly criticize O-Tech for failing to prove its design predications by any testing method, not for failing to provide prototype testing.  For example, the RB-M Project Debriefing of O-Tech stated:  (1) "The proposal does not provide any information regarding how the unique hydrofoil can be supported;" (2) "Although the information provided in this discussion indicates outboard heel may not occur, the lack of concrete data within the proposal (in the form of test data from; the modified test boat: or test data from model testing of similar designs: or actual full scale data from similar full scale boats in the field; or conclusive calculations of the inboard & outboard heeling moments of this design) does not support their claim;" (3) "The proposal fails to provide detailed information concerning the design and performance characteristics of the hydrofoil;" and (4) "The proposal provides a generic description of the basic physical characteristics of the hydrofoil . . . [h]owever, no analysis or calculations are provided to verify the structural adequacy of the hydrofoil, the attachments, and the supporting structure."  AR 40770-72.  Taking the document as a whole, it becomes evident that the USCG's critique focused on the lack of convincing evidence within O-Tech's proposal and not a lack of prototype testing, as O-Tech contends.

Textron also culls quotes selectively from the administrative record.  For example, Textron quotes the USCG as stating, "'[R]eliance on model testing alone is not sufficient to mitigate the unknown effectiveness of the proposed new hull lines." Textron's Br. filed Aug. 25, 2006, at 19.  Yet, as defendant argues in its brief, the quoted language is taken out of context.  Def.'s Br. (Textron) filed Sept. 22, 2006, at 20.  The full quotation reads:

> Given the amount of concern generated during the phase one testing, reliance on model testing alone is not sufficient to mitigate the unknown effectiveness of the proposed new hull lines.  Additionally, independent analysis of the towing tank model and the free flight models test series uncovered two major flaws.

AR 90609.

evaluated the tendency of its proposed vessel to heel outboard. The merits of these technical disputes are addressed below. In both cases, however, the administrative record shows that the USCG fully considered and evaluated the test data that plaintiffs submitted. Unfortunately for plaintiffs, the alternative testing methods failed to persuade the USCG that their proposed vessels met the Phase II Solicitation requirements.

While O-Tech and Textron attempt to characterize Marinette's ability to rely on Phase I test data as an unstated solicitation requirement, the court agrees with defendant that the essence of plaintiffs' challenge goes to the "basic approach to this acquisition." Def.'s Br. (Textron) filed Oct. 16, 2006, at 3. Challenges to the underlying acquisition process at this stage of the procurement are no longer proper. This court recently had two occasions to consider similar protests where plaintiffs have cloaked their challenges to the terms of a solicitation as a protest to the procurement evaluation. In both cases plaintiffs waited to attack the solicitation until after submitting a proposal, leading the court to conclude that the implicit challenge to the solicitation had been waived. See Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487 (2006), appeal docketed, No. 06-5064 (Fed. Cir. Mar. 9, 2006); Bannum, Inc. v. United States, 60 Fed. Cl. 718 (2004), rev'd and remanded on other grounds, 126 F. App'x 958 (Fed. Cir. 2005) (unpubl.).

This issue was most recently discussed in Blue & Gold, 70 Fed. Cl. 487, a pre-award bid protest concerning "the provision [of] ferry services to the historic Alcatraz Island near San Francisco, California." Id. at 489. Plaintiff had asserted that the Park Service "'failed to recognize that the Services Contract Act, 41 U.S.C. §§ 351 et seq. applies to' the wages paid in the contract." 70 Fed. Cl. at 512. The court construed this argument as an attack on the prospectus because "[t]he Park Service has a longstanding policy, codified by regulation, of not applying the prevailing wage provisions of the Service Contract Act to its concession contracts." Id. at 512. Ultimately, the court found that plaintiff's protest to the prospectus after its competitor was awarded the contract was untimely:

> Because no one questioned or protested the relevant terms of the prospectus, the Park Service lacked the opportunity to change them. For plaintiff to protest after submission of the proposals would hamstring the Park Service as it is required by law to 'evaluate . . . competitive proposals and make an award solely on the factors specified in the solicitation.'"

Id. at 513 (quoting 10 U.S.C. § 2305(b)(1) (2000)). To support this finding, the court relied on Bannum, 60 Fed. Cl. 718:

> Plaintiff in Bannum challenged the Bureau of Prisons's evaluation process of certain submitted forms. The trial court construed the challenge as not relating

47

to the evaluation process, but to the terms of the solicitation.  Although the court rejected the strict rules of the GAO, which "require that protests concerning the improprieties with solicitations be filed prior to the bid openings," the court "embraced the utility of such procedures in bid protest realm."  Such procedures "mandate that the bidder raise any problem within the solicitation before submission of the offer, or risk that the reviewing tribunal will regard the right to contest as waived."

Blue & Gold, 70 Fed. Cl. at 513 (citations omitted) (quoting Bannum, 60 Fed. Cl. at 726 (citing Aerolease Long Beach v. United States, 31 Fed. Cl. 342, 358 (1994), aff'd, 39 F.3d 1198 (Fed. Cir. 1994))).

In the instant case, the terms of the Phase II Solicitation gave notice to all offerors that the acquisition was designed as a two-phase procurement process building on the results of the Phase I test boat evaluations. AR 00701.  Moreover, the terms of the Phase II Solicitation explicitly required the offerors to respond to criticisms from the Phase I test boat evaluations. See, e.g., AR 00990-91.  Logically, as with any cumulative process, success at an earlier stage can translate to greater success later on.  If O-Tech or Textron wanted to protest the USCG's approach to purchasing new RB-Ms, they should have protested before submitting their Phase II proposals.  Because neither O-Tech nor Textron elected to do so, the court considers the right to protest the terms of the Phase II solicitation to have been waived.

## 2.  USCG's evaluation of Textron's model testing

Textron argues that the USCG erred in its evaluation of Textron's model testing resulting in two significant weaknesses for Textron, one for uncontrolled turns and another for the "balance between uncontrolled turns and porpoising." 27/  Textron's Br. filed Aug. 25, 2006, at 20.  Moreover, Textron contends that the misevaluation infected the USCG's evaluation of Textron's FPR design.

The USCG expressed concerns regarding the tendency of Textron's design to "spin-out" during turns since the early stages of this procurement.   See, e.g., AR 40042 (referencing problems with Textron's test boat).  In the USCG's letter readmitting Textron to the competitive range on March 17, 2006, the USCG specifically identified this issue as a topic that Textron must address in its FPR:

---

27/  "'Porpoising' refers to a tendency of a boat to bounce up and down even while proceeding in calm water." Def.'s Br. (Textron) filed Sept. 22, 2006, at 23 n.15 (citation omitted).

The [initial Phase II] proposal indicates full scale and model testing was conducted in an attempt to correct the spin-out problems associated with the Test Boat. However, the data provided in the proposal [are] not sufficient to demonstrate that the tendency of the craft to "spin-out" during high speed, hard-over turns has been eliminated. Additionally, the changes made to the proposed hull design to improve seakeeping have raised questions about possible "porpoising" behavior at high speed. This effect was displayed in their model testing and discussed in the design engineers comments (Appendices 4.5-4.6). These factors increase the risk of not meeting the performance requirements, specifically, "In turns, at all turning rates, at all speeds, and in all loading conditions, the RB-M shall maintain a steady turn rate without skidding." (SOW 051-2.4) and "The RB-M shall be safe and controllable at all speeds up to the maximum attainable speed and under all specified loading conditions." (Spec 051-2.2)

AR 40042-43 (emphasis added).

In response to these comments, Textron attempted to convince the USCG that its RB-M would not demonstrate these undesirable characteristics by revising its proposal to include more information about the model testing that it conducted and relied upon in making its speed and power predictions. The calculations and test data that were added to Textron's proposal in response to this criticism were included as part of Textron's FPR in Appendix 4.5-1: Model Tow Tank Test Results and Speed-Power Performance Calculations. 28/

Appendix 4.5-1 stated that Textron's predictions for its vessel's speed and power performance were based on the results of "1/8-scale model tests of the proposed RB-M configuration." AR 10746. The calculations included as part of Appendix 4.5-1 "were revised from methods used to prepare the RB-M phase I test boat performance predictions." AR 10746. The RB-M model was tested at the Davidson Laboratory, Stevens Institute of Technology in Hoboken, New Jersey. Tests were conducted in two sessions on June 7-11, 2004, and June 28-July 2, 2004. "In each session there were limited calm water test runs of spray rail, chine configurations, and further testing of the final configuration in random sea state 2, sea state 3, and regular waves." AR 10747.

---

28/ Textron made changes to other parts of its FPR in response to these comments, including amending the text of its FPR to provide more model testing data. See, e.g., AR 10744-828; AR 10266 (yellow highlighting or yellow pages indicate that revisions were made between submission of initial Phase II proposal and FPR).

As part of Appendix 4.5-1, Textron included Davidson Laboratory's Technical Report SIT-DL-04-9-2829 A (the "Davidson Technical Report"), issued September 2004, as Scaled Model Tests of Three Planing Hulls: Calm Water Tests.  AR 10779.  The Davidson Technical Report documented the results of model resistance tests that it conducted on behalf of Textron.

> Model[s] of the two bare hulls were built to a scale of 1/8th; Patrol Boat Model – Baseline, and Patrol Boat Model – Experimental (PBM–B & PBM–E respectively) were provided by [Textron].  The PBM-E model was modified at the Davidson Laboratory machine shop after testing on it was completed to convert the keel from a V-shape, to a round bottom configuration based on templates provided by [Textron].  The modified PBM-E model is referred to as Patrol Boat Model – Experimental Round (PBM-ER).

AR 10784 (formatting omitted).  After receiving Textron's FPR, the USCG had its independent consultant CDI analyze the new data submitted by Textron.

### 1) Turn instability and porpoising

Textron argues that the USCG erred when it assigned a "significant weakness" to Textron's RB-M design for uncontrolled turns and porpoising.  AR 40359.  The premises of Textron's contention are that (1) CDI's analysis was fundamentally flawed and (2) it was unreasonable for defendant to argue that the USCG did not rely on the CDI evaluation.

Textron posits that CDI misevaluated two specific aspects of its scaled model.  First, in conducting a comparison between Textron's proposed design and its scaled model, CDI used the "wrong values for the model's beam at chine."  Textron's Br. filed Aug. 25, 2006, at 20.  Secondly, Textron states that the USCG used the incorrect value for deadrise at midship.

### a) Chine length 29/

In comparing Textron's proposal dimensions with those of its tow tank model, CDI found discrepancies between the chine beam length of Textron's tow tank model versus Textron's proposed chine beam length.  CDI discussed these discrepancies in Technical

---

29/  "Chine is the intersection between the sides and the bottom of a flat or v-bottom boat.  Thus, 'beam at chine' refers to the beam (width) of the boat at the chine." Def.'s Br. (Textron) filed Sept. 22, 2006, at 22 n.13 (citation omitted).

Memoranda #807.001-35 and #807.001-36 issued June 14, 2006.  AR 40108 ("Textron's conclusions are based on hull forms with different deadrise and angles and chine beams."); AR 40086 ("It can be seen in Table 1 that the chine beam of the proposed RB-M hull form is over 9 inches (6% greater) than the PB-M(E) and PB-M(ER) hull forms.").

Initially, Textron's August 25, 2006 filing argued that "CDI used the wrong values for the model's beam at chine."  Textron's Br. filed Aug. 25, 2006, at 20.  In its reply brief filed October 10, 2006, however, Textron modified its argument, stating:

> Defendant admits that Textron's proposal identified the beam of its model as correlating to [        ] . . . . However, defendant chose to evaluate Textron's model testing using another portion of Textron's proposal that erroneously identifies the model beam as correlating [        ].

Textron's Br. (Def.) filed Oct. 10, 2006, at 27 (citations omitted).  Between August 25, 2006, and October 10, 2006, Textron apparently identified an error in the data submitted in its FPR.  William Keith DuBose, the Principal Skirt Systems Engineer of Textron, declares:

> In Textron's proposal, the beam of the model is identified as corresponding to a full-scale beam of [        ].  This is incorrect.  In preparing its Phase II proposal, Textron used a chart of dimensions that it had created when setting out the initial concepts of the Phase II craft, and updated that chart to reflect the final dimensions of the Phase II vessel.  Somehow, although the beam of the vessel had changed, that change was not made to the chart.  That is how the incorrect figure of [        ] was included in the proposal.

Decl. of William Keith DuBose, Oct. 10, 2006, ¶ 8.  Textron asserts that the USCG should have identified this discrepancy and requested a clarification.  Textron's Br. (Def.) filed Oct. 10, 2006, at 26-28 (contending that the USCG asked several clarification questions of Textron, but "did not raise this simple issue").

A review of the administrative record confirms that, as Textron admits, its FPR alternatively identifies the full-scale beam of the model as [        ] or [        ].  In Table 4.5.3-1, located in the body of Textron's proposal, the chine beam length of the tow tank model PBM-E is listed—according to Textron, accurately—as [        ], while the chine beam length of both the PBM-E and PBM-ER is shown as [        ] in Table 4 of the Davidson Technical Report.  30/  AR 10792, AR 10266.

---

30/  The PBM-E is also identified in the Model Tow Tank Test Results and Speed-Power Performance Calculations, Table 1, as having a maximum chine beam length of [        ].  AR 10748.

Defendant responds, and the court agrees, that the USCG and CDI were reasonable in relying on the values reported in Davidson Technical Report and other data contained in Appendix 4.5-1, because it was "the very test report that addressed the boat's geometry and investigated beam at chine rather than an unexplained, unsupported contrary value stated in Textron's FPR," which the USCG had already evaluated in Textron's initial Phase II proposal and found unconvincing. Def.'s Br. (Textron) filed Oct. 16, 2006, at 23; see also Decl. of Daniel G. Bagnell, Sept. 14, 2006, ¶¶ 6-7. The data in the Davidson Technical Report was submitted as part of Textron's proposal, and it was Textron, not the USCG, that was responsible for ensuring that the information in the FPR was accurate. Textron itself does not appear to have identified this "error" until it was well into its second bid protest. That the USCG would rely on the information submitted as part of Textron's FPR is not only reasonable, it is expected.

Additionally, the court agrees with defendant that no purpose would have been served by requesting a clarification. The FAR defines "clarifications" as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." FAR 15.306(a). "The 'acid test' for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal." In re Nat'l Beef Packing Co., B-296534, 2005 CPD ¶ 168, at 11; see also In re Priority One Services, Inc., B-288836, 2002 CPD ¶ 79, at 3 (stating "clarifications are merely inquiries for the purpose of eliminating minor uncertainties or irregularities in a proposal and do not give an offeror the opportunity to revise or modify its proposal"). Neither is the Government required to reopen discussions with an offeror when an issue arises for the first time in an FPR. See In re Litton Sys., Inc., Am. Div., B-275807, 97 CPD 97-1¶170, at *4 (finding that since issue arose for first time in protestor's Best and Final Offer (the "BAFO"), "the agency was under no obligation to reopen discussion with [the protestor], or otherwise seek clarification from [protestor], about what the BAFO entry meant").

Defendant persuasively argues that requesting a clarification on this point would have served a limited purpose: "If Textron responded [to a clarification request] that its FPR narrative was correct, that would have endorsed the value [it] now asserts is the correct one, but that would mean that there was no analysis supporting that value." Def.'s Br. (Textron) filed Oct. 16, 2006, at 23. Under this scenario, Textron and the USCG would be left in the same situation that they confronted when Textron was readmitted into the competitive range, namely, that Textron made speed and power predictions with no supporting model test data. "If, on the other hand, Textron responded that its test report was correct, the analysis in the report would support that smaller value," id. at 23, and CDI's evaluation. No matter what response Textron provided the USCG, a clarification would have established only that Textron's FPR predictions were unsupported. Moreover, because the data and calculations

supporting Textron's scale model tests were not included in any of the proposals submitted prior to its FPR, the USCG could not have identified the issue before this juncture.

b) Deadrise 31/

Textron argues that CDI misevaluated Textron's scale model testing when CDI concluded that the deadrise at midship of the RB-M design was [          ], as opposed to Textron's proposed value of [          ]. Textron's Br. filed Aug. 25, 2006, at 20. Textron argues that "CDI compares CDI's deadrise value for the design to Textron's value for the model. Thus, the supposed discrepancy between these two values **arises from CDI's use of a different method**, not any real flaw in the scaling of the model." Textron's Br. (Def.) filed Oct. 10, 2006, at 26 (boldface in original). Textron's analysis stops there. Textron fails to explain why the use of a different methodology should result in a different value or why the methodology CDI used was improper. Textron's expert Prof. Mansour indicates that there may be more than one correct methodology for calculating deadrise. Instead, Textron asserts that "[h]ad defendant asked, Textron could have confirmed that the deadrise of its model matches that of its full-scale design." Textron's Br. (Def.) filed Oct. 10, 2006, at 26.

The CDI evaluation identified the FPR value for deadrise at midship as [        ] and the deadrise at midship of the PBM-(E) and PBM-(ER) as [          ]. AR 40080. CDI calculated that the deadrise at midship of the proposed RB-M was 3 degrees or 13.5% greater than model hull forms. AR 40080. Textron takes the position that the USCG acted unreasonably by comparing CDI's calculations for deadrise at midship of the RB-M design against Textron's calculations for deadrise at midship of the PBM-(E) model. Textron's expert William Keith DuBose states that "when a consistent method is used to calculate the deadrise of both the full-scale design and the model, at the same hull station, the results show that the model accurately reflects the design." Decl. of William Keith DuBose, Oct. 10, 2006, ¶ 6.

Yet, the purpose of conducting the CDI analysis was to verify Textron's predications about the performance of its design. Textron has failed to show how CDI's analysis, and the USCG's consideration of that analysis, was somehow irrational or incorrect. Moreover, the Director of Naval Architecture for CDI, Daniel G. Bagnell, states that the analysis of deadrise at midship figure was conducted to verify Textron's claims that its RB-M would not porpoise "even though the free flight models exhibited this characteristic." Decl. of Daniel

---

31/ "Deadrise is the angle of the boat's bottom relative to the horizontal. A flat bottom boat has a deadrise of 0 degrees while a boat with a deep-V bottom might have a deadrise of 25 degrees." Def.'s Br. (Textron) filed Sept. 22, 2006, at 22 n.14.

G. Bagnell, Sept. 14, 2006, ¶ 10. A review of the CDI reports indicates that deadrise at midship was primarily discussed as a factor of CDI's porpoising analysis. <u>See</u> AR 40085-40106. Significantly, when CDI analyzed the tendency of Textron's RB-M design to porpoise, CDI purposefully relied on Textron's value [          ], rather than on CDI's calculated value for deadrise [       ]. <u>Compare</u> AR 40091 <u>with</u> 40088.

Once again, Textron seeks a finding that the USCG somehow acted irrationally by not asking Textron for a clarification. "Had defendant asked, Textron could have confirmed that the deadrise of its model matches that of its full-scale design." Textron's Br. (Def.) filed Oct. 10, 2006, at 26. Textron fails to explain how a confirmation that the deadrise of its model is the same as its RB-M design would further its cause. The purpose of the CDI analysis was to verify Textron's predictions. To have Textron assert that the values were the same would not have served any practical purpose. Textron has failed to convince the court that CDI or the USCG misevaluated its scale model data. In fact, a review of the administrative record confirms that Textron failed to provide sufficient data to support its predictions. Neither CDI nor the USCG acted irrationally or improperly in evaluating Textron's scale model testing, and Textron has failed to persuade the court that the USCG wrongfully did not ask for a clarification.

### 2) <u>Discussions and proper scaling of Textron's model</u>

Textron argues that defendant failed to conduct meaningful discussions, because the USCG never raised concerns over Textron's scale modeling during the discussions held on March 26, 2006, between the USCG and Textron. According to Textron, the problems with its scale model could have been resolved easily had it been advised of the problems earlier. Textron's Br. (Def.) filed Oct. 10, 2006, at 27.

Pursuant to FAR 15.306(d)(3), the USCG was under an obligation to discuss important shortcomings in Textron's proposal:

> At a minimum, the contracting officer must, . . .indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer be altered or explained to enhance materially the proposal's potential for award.

<u>Id.</u>; <u>see</u> <u>In re Al Long Ford</u>, B- 297807, 2006 CPD ¶ 68, at *5 (stating "[w]here contracting agencies conduct discussions with offerors whose proposals are within the competitive range,

the discussions must be meaningful.  In re Professional Services Group, Inc., B-274289.2, 97-1 CPD ¶ 54, at 3.; In re Mechanical Contractors, S.A., B-277916, B- 277916.2, 98-1 CPD ¶ 68, *3 (stating "[d]iscussions cannot be meaningful if an offeror is not advised of the weaknesses, deficiencies, or excesses that must be addressed in order for the offeror to be in line for the award"); In re CitiWest Properties, Inc., B-274689.4, 98-1 CPD ¶ 3, at 5; In re Columbia Research Corp., B-247631, 92-1 CPD ¶ 539, at 5.

Textron's position is unavailing because the USCG did not have the opportunity to identify the problems with Textron's scale modeling until Textron submitted its FPR.  For example, the chine beam length dispute discussed above arose precisely because of the new data that Textron included in its FPR.  See AR 10841.

In the discussions held on March 26, 2006, prior to Textron's submission of its FPR, the USCG instructed Textron to submit the test data that supported its model testing.  AR 90009-10, 90014.  Cmdr. Doherty stated, in reference to Textron's predictions for acceleration, that

> the information that was provided in the initial proposal described a methodology for determining the motions of the proposed design, for instance, your testing methods, that the evaluators found to be materially flawed . . . . there are probably a lot more data in the study that was done that was called out.  We need to be able to see all the data, works and all to be able to confirm that your conclusion is reasonable.

AR 90009-10.

Textron now cannot persuasively argue that the USCG failed to conduct meaningful discussions.  The USCG can only discuss items of which it was aware; the only way the USCG could have known about this problem was if Textron had provided the information prior to discussions.  That was not the case.  The USCG requested the information, demonstrating (1) that it could not have notified Textron of the problem earlier, and (2) that the USCG intended to examine the information.  AR 90014.  Thus, Textron was notified during discussions that the USCG intended to analyze and rely on the information that Textron provided in its FPR regarding its scale model testing.

### 3.  Reliance on CDI evaluations

Textron argues that defendant's position is somehow flawed because the latter contends that the USCG did not rely on the CDI evaluations.  The court finds that the USCG rationally evaluated Textron's FPR for porpoising, uncontrolled turns, and the balance of uncontrolled turns and porpoising.  The RB-M Evaluation Worksheet completed by the NPET team and the RB-M Evaluation Worksheet Notes on these issues indicate that the

NPET relied on CDI's analysis, as well as Textron's own model test data.  AR 40401-08; AR 40364-69. Certainly, as defendant and Marinette state, the record supports the conclusion that the USCG relied more heavily on Textron's own FPR model test data, with only occasional references to the CDI analysis, because the NPET devoted a considerable number of words in its evaluation to describing how the model tests that Textron submitted demonstrated a tendency for the design to porpoise, experience uncontrolled turns, and failed to solve the "balancing act" between the two operational issues in its final design.  AR 40401.

Textron also contends that defendant "fundamentally misstates the content of Textron's proposal." Textron's Br. (Def.) filed Oct. 10, 2006, at 28.  Defendant admits in its opening brief that it "erroneously stated that Textron's model could be subject to uncontrolled turns at up to 14 knots." Def.'s Br. (Textron), filed Oct. 16, 2006, at 27 n.20. Textron fails to offer any support for its argument that the USCG misstated or misunderstood Textron's proposal in its Non-Price Evaluation.  Consequently, the court finds that the USCG rationally evaluated Textron's FPR.

4. Classification of Textron's battery charging system

Plaintiffs insist that the USCG improperly assigned a deficiency to Textron's battery charging system.  Section 313-1.1 of the Phase II Solicitation required the proposed RB-M to have two banks of batteries.  AR 00917.  Section 313-1.2 of the Phase II Solicitation required offerors to provide "[a] battery parallel switch . . . to connect both battery banks for emergency power or emergency engine starting.  During normal operation this switch will be in the open position." AR 00918.  According to Textron's expert Gerald N. Jensen, a Project Engineer with Textron, although Textron's FPR proposed using a battery charging system that included a parallel switch, the proposal was designed to allow both engines to charge "[w]hen the switch is maintained in the closed position." Decl. of Gerald N. Jensen, July 11, 2006, ¶ 8.

Textron contends that its proposal meets the Phase II Solicitation requirements: "Textron's battery charging system, in fact, does comply with the specification, because it permits both engines to charge both batteries . . . . [The] USCG can, if it so chooses, adopt [the closed position for the switch] as the Normal Operating Condition." Textron's Br. filed Aug. 25, 2006, at 18.  Because the flaw easily could be corrected, it should not have been classified as a "deficiency" because, in Textron's opinion, the flaw was not "material."  Id.

An agency's technical evaluation is accorded great deference from the trial court, as the Federal Circuit articulated in E.W. Bliss: "[The] twelve other substantive challenges to the procurement . . . deal with the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve

56

discretionary determinations of procurement officials that a court will not second guess." 77 F.3d at 449 (emphasis added); see also Advanced Data, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential.").

Textron has failed to show that the USCG acted arbitrarily or capriciously. The PEP defines a deficiency as "a material failure of the proposal to meet a requirement or a combination of significant weaknesses that increase the risk of unsuccessful performance to an unacceptable level." AR 00616 (adopting the definition of deficiency provided in FAR 15.001). FAR 1.108 provides that "[u]ndefined words retain their common dictionary meaning." Because neither the FAR or the Phase II Solicitation defines the term "material," Textron relies on FAR 1.108 to argue that the USCG misidentified its battery charging problem as a "deficiency." Textron argues, that, based on Webster's II New College Dictionary (2001 ed.), the term "material" is synonymous with the word "substantial." Therefore, the classification was arbitrary because the USCG admitted that the deficiency was easily corrected. Textron's Br. filed Aug. 25, 2006, at 17-18.

This argument cannot succeed because the USCG has determined rationally that the battery charging system does not meet the Phase II Solicitation requirements. AR 40360. Defendant's analogy is apt: "When a car runs out of gas, that problem is a 'deficiency' that is both 'material' and 'substantial,' notwithstanding that is can be easily corrected. The fact remains that, until gas is added to the gas tank, the car is not going anywhere." Def.'s Br. (Textron) filed Sept. 22, 2006, at 16 n.9. Moreover, Textron misplaces its reliance on Webster's II New College Dictionary. The Federal Circuit has rejected dictionary definitions as controlling, see, e.g., Teg-Paradigm Envtl., Inc. v. United States, 2006 U.S. App. LEXIS 24520 (Fed. Cir. Sept. 6, 2006) (rejecting, in a contract case, plaintiffs' reliance on Webster's College Dictionary definition of "surface"). This court will not declare an agency decision arbitrary or irrational based on the potpourri of dictionary definitions of a word. Recognizing that the deficiency was easily corrected, the Source Evaluation Board (the "SEB") assigned Textron a "yellow" rating (marginal) in this category, signifying that the problem could be corrected "without major revisions to the proposal." AR 40121 (assigning Textron a "yellow" rating); AR 00617 (defining a "yellow" rating). Therefore, the USCG's evaluation of Textron's RB-M proposal accurately reflected that its proposed design did not meet the Phase II Solicitation requirement, but that the problem could be easily corrected. AR 40359-60.

5. <u>USCG's assignment of a significant weakness to O-Tech's RB-M for outboard heel</u> 32/

O-Tech argues that the USCG unreasonably assigned O-Tech's proposal a "significant weakness" for the boat's tendency to outboard heel.  <u>See</u> AR 40201.  During the Phase I testing of the RB-M test boats, crew members identified the tendency to heel outboard.  AR 50424. The Response Boat-Medium (RB-M) Mission Effectiveness and Supportability Phase Report—RBM 54110 (Ocean Technical Services) of July 2004 ("Mission Effectiveness Report (O-Tech)") stated that "[O-Tech's] boat had a tendency to heel outboard after 90 degrees of turn from cruising (25 knots) to full throttle." AR 50424.

In response to these crew comments and feedback from the USCG during discussions, O-Tech made four alterations to its Phase I test boat, which O-Tech tested on July 5, 2004.  Def.'s Counter-Stmt. of Facts (O-Tech) filed Sept. 22, 2006, ¶ 29.  Appendix E of O-Tech's FPR contained a section entitled "Hydrodynamic Evaluation of Heeling During Turns," which addressed the USCG's concerns.  AR 30479-87.  O-Tech argues that (1) the outboard heel problem was "documented only qualitatively," insinuating that the outboard heel problem was not real; (2) the USCG erroneously discounted the Hydrodynamic Evaluation of Heeling During Turns; (3) the USCG failed to consider video evidence of "documented trials performed on the Phase I test boat;" and (4) the USCG unevenly evaluated O-Tech's FPR for outboard heel as compared to Marinette's FPR for range.  O-Tech's Br. filed Oct. 10, 2006, at 17-18; O-Tech's Br. filed Aug. 25, 2006, at 16.

1) <u>The USCG properly identified outboard heel as problem in O-Tech FPR</u>

O-Tech attempts to imply that the outboard heel issue was not truly a problem by arguing that the outboard heel was "documented only qualitatively" and referring to the test boat crew comments as "spurious."  O-Tech's Br. filed Aug. 25, 2006, at 16; O-Tech's Br. (Def.) filed Oct. 10, 2006, at 17. Defendant successfully has demonstrated that outboard heel was identified as a problem throughout the procurement; O-Tech failed to dispute the USCG's crew comments previously; and, most importantly, O-Tech admitted that outboard

---

32/ "'Outboard heel' describes an undesirable phenomenon that some boats experience when turning.  If a boat is turning to the left, it should lean (or 'heel') to the left to help the crew maintain their position on the boat.  This is known as 'inboard heel.'  If a boat turning left heels to the right–outboard of the turn–it makes it difficult for the crew to maintain position, due to centrifugal force.  This is known as 'outboard heel.'"  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 14.

heel was a problem with its RB-M design in its FPR.  AR 50015-17 (informing O-Tech of the discrepancies manifested in its Phase I Test Boat, including outboard heel, that needed to be addressed); AR 30297 ("[The tendency of O-Tech's boat to heel outboard] was valid and has been addressed through a design change.").  Moreover, O-Tech has not cited to any requirement in the Phase II Solicitation or law that requires the USCG to quantitatively identify problems with proposed designs.  Indeed, it would be nigh impossible for the USCG to document the problem quantitatively, because the precise reason O-Tech received a significant weakness for outboard heel was due to a lack of information.  AR 40118.  Test crews experienced the outboard heel phenomenon, and then O-Tech refused to provide quantitative evidence that the problem did not exist.  Therefore, it was reasonable for the USCG to fault O-Tech for its failure to provide evidence that their RB-M design would not heel outboard.

> 2) The USCG properly considered the information provided by O-Tech
> in its FPR

Although the USCG acknowledged that O-Tech attempted to mitigate the outboard heel problem and provide more information in its FPR, the USCG did not find the additional information persuasive.  AR 40247.  As the NPET goes to great lengths to explain in its June 14, 2006, evaluation, sufficient data were not provided to verify that O-Tech had solved the problem:

> Although the information provided [in O-Tech's FPR] indicates outboard heel may not occur, the lack of concrete data in the form of test data from the modified test boat, test data from model testing of similar designs, actual full scale data from similar full scale boats in the field, or conclusive calculations of the inboard & outboard heeling moments of this design, this information does not support their claim.[sic]  The proposal indicates that this information exists, but it is not provided. As a result, there is a significant risk that the proposed design will not maintain an inboard heel during turns. The impact of accepting the proposal as written is that there is a significant risk that the boat will not meet the requirements for heeling in turns (Spec. 051-2.4). This requirement was imposed to ensure the safety of crews during all operations, including the prevention of crew being thrown overboard in high-speed tactical maneuvers that are unique to the USCG. Otech claims that there is difficulty of modeling the HysuCat design and because of the apparent proprietary nature of the existing HysuCat designs and test data, it is likely that if this phenomenon occurred it would not be detected until OT&E.

AR 40247 (emphasis added).  A review of O-Tech's FPR indicates that O-Tech was unwilling to provide the USCG with the underlying data necessary for the USCG to evaluate O-Tech's craft for outboard heel and implies the USCG evaluators do not possess the necessary education to accurately evaluate such data:

> The analysis and discussion below describes the hydrodynamic forces effecting the heeling of the Team Otech RBM Test Boat and the Phase II proposed RBM.  The purpose of this analysis is to explain the lift characteristics unique to the hydrofoil section shapes and spray rails developed specifically for application to Hysucat hull forms . . . .

> This development effort created an extensive database of hydrodynamic characteristics related to Hysucat technology.  This data is proprietary to Foil Assisted Shop Technologies; CC (FAST) and is considered highly confidential.  In addition the data [are] highly complex and require[] extensive education, knowledge and experience in theoretical hydrodynamic in order to comprehend and evaluate in detail. Therefore, the analysis and discussion presented [here] provide[] an overview of the hydrodynamic characteristics of the Team Otech RBM related to heeling in turns at a level that can be understood by technical evaluators without highly complex numerical analysis or need for detailed data which [are] not available for distribution.

AR 30480.  Contrary to O-Tech's argument, the information that O-Tech provided to the USCG was not discounted; indeed, it caused the USCG to improve its evaluation of O-Tech's Mission Effectiveness from a "deficiency" to a "significant weakness."  Compare AR 40771 with AR 40018.

### 3) USCG's refusal to consider video evidence

In response to the crew comments that stated that O-Tech's "boat had a tendency to heel outboard after 90 degrees of turn from cruising (25 knots) to full throttle," AR 50424, O-Tech proposed alterations to its Phase II design intended to solve the outboard heel problem.  During Phase II, O-Tech fitted its Phase I test boat with design alterations and conducted trials on July 5, 2004.  Def.'s Counter Stmt. of Fact (O-Tech) filed Sept. 22, 2006, ¶ 29.  A video was made of these trials, which, according to O-Tech, demonstrates that "the craft exhibit[ed] strong inboard heel for over 720 degrees of turning at speeds between 25 knots and top speed (42.5 knots)."  O-Tech's Br. filed Aug. 25, 2006, at 21 (citing Barr Decl. ¶ 39 and Decl. of Brennan J. Smith, Aug. 24, 2006, ¶¶ 5-6).  O-Tech contends that this video is its "best information" that the RB-M consistently would heel inboard during turning and that the USCG improperly and unfairly denied O-Tech's request to consider the video

documentation.  O-Tech's Br. filed Aug. 25, 2006, at 21.  O-Tech's argument is neither supported by any citation to the Phase II Solicitation requiring the USCG to accept video nor any evidence indicating that the USCG accepted video from other offerors.  O-Tech's Br. filed Aug. 25, 2006, at 21-22.

The USCG refused O-Tech's request to submit video evidence during the March 22, 2006, United States Coast Guard—O-Tech Discussions.  According to the transcript of proceedings, the USCG refused O-Tech's request, because the USCG decided during the Phase I Solicitation process that offerors would not be allowed to submit video evidence: "A question that came during the solicitation process one of the offerors wanted to supply video. We denied that for several reasons, and those reasons haven't changed right now. There are other options open . . . . Still frame pictures. Still frames with a video annotation." AR 90147.  As defendant noted during oral argument, the USCG expected O-Tech to include still frame pictures in its FPR or provide the underlying data.  Tr. 201-02.  O-Tech did neither.

4) The evaluation of Marinette's design to meet range requirements v. the evaluation of O-Tech's design to heel outboard

In its reply brief O-Tech raises, for the first time, the argument that it was treated inequitably because

[t]he [USCG] found, despite all the contrary evidence before it, that Marinette satisfied the range requirement based solely on Marinette's representation in its final proposal concerning tests on its Phase I craft.  In contrast, where there was absolutely no contrary evidence before it the [USCG] rejected O-Tech's empirical analysis and statement in its final proposal revision that, based on testing, its modified Phase I test boat maintained inboard heel through 560 degrees of turning.

O-Tech's Br. (Def.) filed Oct. 10, 2006, at 18.

In arguing that the USCG inequitably evaluated the RB-M proposals, O-Tech cites 10 U.S.C. §§ 2304-05 and Krygoski Constr. Co. v. United States, 94 F.3d 1537 (Fed. Cir. 1996), for the proposition that the Competition in Contracting Act "mandates impartial, fair, and equitable treatment for each contractor."  Id. at 1543. 33/ O-Tech implies that the standard

_____

33/  O-Tech also selectively quotes from Seattle Security Services, Inc. v. United States, 45 Fed. Cl. 560, 569 (Fed. Cl. 1999), which states "it is fundamental that the

of review for examining this aspect of the procurement is that offerors must not be treated inequitably. O-Tech's Br. (Def.) filed Oct. 10, 2006, at 18. Krygoski Construction, 94 F.3d at 1542-43, is not as applicable to the case at bar, as O-Tech would argue. In Krygoski Construction the Federal Circuit was discussing a contracting officer's responsibility to maintain full and open competition in a procurement process in the context of his decision to terminate a contract for government convenience. He permissibly could terminate a solicitation to ensure equitable treatment of all offerors. 34/ In this case, the applicable standard as stated in 10 U.S.C. § 2305(b)(1) is that "[t]he head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." Id. (emphasis added).

When an evaluation has been challenged, as in this case, the court examines the procurement "'to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.'" E.W. Bliss, 77 F.3d at 449 (quoting In re Offshore Corp., B-251969.5, B-251969.6, 94-1 CPD ¶ 248, at 3); see also Galen Med., 369 F.3d at 1330 (endorsing and quoting standard from E.W. Bliss and stating "[b]ecause the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." (Citations omitted.)

If the court had found that the USCG had treated Marinette and O-Tech inequitably, giving Marinette a benefit that it had not accorded the other offerors, that finding could contribute to a determination that the USCG acted arbitrarily and capriciously. However, the court has found no evidence of such disparate treatment. The USCG acted reasonably in requesting data from O-Tech to prove that its design would not heel outboard. O-Tech was asked to address the outboard heel problem since the earliest stages of this procurement. If O-Tech disputed that outboard heel was a problem in its design, it could have addressed the

---

33/ (Cont'd from page 61.)

contracting agency must treat all offerors equally" in reference to the standard for considering offerors' past performance history. In implying that this is the legal standard for review of the USCG's procurement decision, O-Tech fails to recognize that the court must defer to the agency's decision unless a protestor can prove that the agency acted arbitrarily or capriciously. See, e.g., Bannum, 404 F.3d at 1351.

34/ While section 2304 of the United States Code addresses the competition requirements for competitive procurements, it does not specifically address evaluating proposals in negotiated procurements. 10 U.S.C. § 2304.

problem years ago with the USCG.  Instead, in its final proposal, O-Tech finally attempted to address the problem without providing the kind of information that the USCG explicitly called for in discussions.  See AR 40018.  Given the circumstances surrounding the outboard heel issue, it is impossible for the court to find that the USCG acted arbitrarily or capriciously.  Although Marinette provided data as requested by the USCG to address the range issue, O-Tech declined to submit the necessary information, insulting the USCG's ability to analyze such complex data and failing to submit other evidence that its boat met the solicitation requirements.  See AR 30479-87.  O-Tech has failed to prove that the USCG acted arbitrarily and capriciously in its evaluation of the outboard heel.

_____          6.  USCG evaluation of O-Tech's engine room proposal
_____

O-Tech contends that the USCG irrationally assigned a deficiency to O-Tech's proposed RB-M for engine room access.  Since the earliest stages of the procurement process, the USCG identified engine room access as a problem in O-Tech's design.  E.g., AR 40018.  In the March 17, 2006, discussion letter, which readmitted O-Tech to the competitive range, the USCG listed the Phase II Solicitation subsections that O-Tech's design failed to meet:

> The proposal fails to demonstrate sufficient access to the engine room for conducting underway inspection, damage control, and repair for inport maintenance and repair (Spec. 071-1 and 088-1).  Accessibility was a concern noted in the phase one test boat mission effectiveness crew comments (Sec. C-10)[;] however, it does not appear these issues were addressed satisfactorily . . . .  A CCTV system is proposed to provide 2 cameras per engine room meeting the requirements of Spec 070-2.11; however, the access requirements of Spec 071-1.4 cannot be met by cameras alone.

AR 40018-19.  In an attempt to remedy this problem, O-Tech modified its RB-M design to provide greater access to the engine room: "O-Tech raised the deck and moved the engines and other equipment forward to improve access in the engine room . . . . [and] identified all routine maintenance items as being located on the front or rear of the engines."  O-Tech's Br. filed Aug. 25, 2006, at 18; see also AR 30104-06 (O-Tech's FPR discussing the changes made to its engine room); AR 30532-33 (showing drawings of O-Tech's proposed engine room).  The proposal also added another hatch for each engine room and provided more information about access to the engine room for inspection and maintenance.  AR 40281.

As a result of these changes, the USCG improved its rating of the RB-M's "underway inspections of engine room," this time assigning O-Tech a weakness, rather than a

deficiency. AR 40281. 35/  The NPET also found that O-Tech had resolved its problems with "access forward."  Despite the improvement in these isolated areas, the NPET still found O-Tech's design deficient in four areas:  (1) "Accessing the bilge (Spec 071-1.5 & Spec 100-4.4);" (2) "Access to the sides of the engine/underway casualty response (Spec 071-1.4 & 1.9);" (3) "Difficulty performing maintenance inport (Spec 071-1.1 & 071-1.9, Spec 088-1.1.12 & 088-1.1.13);" and (4) "Difficulty accessing engine spaces (Spec 071-1.8, Spec 088-1.18, 088-1.16, 088-1.12& 088-1.1.13)."  AR 40281. 36/

O-Tech contends that the USCG's findings are demonstrably false, relying on the Declaration of Louis T. Codega, Aug. 24, 2006.  Mr. Codega's declaration addressed each of the four deficiencies and nine specifications cited by the NPET in turn and offered his assessment on the NPET's findings.  Id.

The court has considered O-Tech's attacks on the USCG's evaluation and finds that O-Tech has failed to show that the USCG acted arbitrarily and capriciously.  What O-Tech shows through the declaration of its expert Mr. Codega is that he would evaluate the engine room access on O-Tech's design differently than did the NPET.  To prevail O-Tech must not offer a different evaluation, but must prove that the USCG's evaluation and decision was irrational.  This O-Tech has failed to do.

---

35/     The original proposal was given a 'deficiency' for not having adequate access to the engine room to conduct inspections underway.  The revised proposal adds another hatch for each engine room to provide a method of accessing the aft end of the engine room for inspections underway.  Although this provides better access to the engine room, it has a negative [e]ffect on conducting engine room rounds.

AR 40281.

36/   O-Tech also challenges the USCG's engine room evaluation because it claims that the USCG improperly failed to identify the issues prior to its FPR evaluation on June 14, 2006.  Defendant responds that these problems were identified as a result of new information provided by O-Tech, such as new drawings with "man-sized silhouettes included."  AR 40283; Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 23.  Defendant has shown that O-Tech was on notice of the four issues that it eventually received a deficiency for failing to remedy.  AR 40030-31; AR 50420; AR 90159.

1) <u>Access to the bilge areas</u>

The NPET assigned O-Tech a deficiency for O-Tech's failure "to demonstrate sufficient access to the engine room [in its FPR] for: accessing the bilges beneath the engines for damage control (Spec 071-1.5)." <u>37/</u> AR 40769.  The NPET came to the conclusion that the size of the engine area in O-Tech's design would make it difficult for the USCG to access the bilge section of the boat located directly below the engine, "the most likely area for collection of oil from the engine." AR 40282. The NPET remarked:

> If the proposal is accepted as proposed, the problem may be identified and corrected through the HSI effort discussed in section 3.5, page 3-36 of the proposal.  However, it is likely that the issue can not be completely resolved due to the confined space of the engine room resulting from the catamaran design.  The proposal explicitly acknowledges the risk of limited engine room space with a catamaran design.

AR 40285.

O-Tech's expert Mr. Codega responds to this finding by suggesting that the engine room bilge area met the specification requirements because the bilge area could be "accessible for inspection, cleaning and dewatering . . . . by reaching over the frame and beneath the engine." Codega Decl. ¶ 5b).  If Mr. Codega were evaluating O-Tech's FPR on behalf of the USCG, he would be free to make a determination that "reaching over the frame and beneath the engine" was sufficient access to the bilge.  <u>Id.</u>  The USCG, however, determined that the space in the engine room was too limited to meet the Phase II Solicitation criteria.  AR 40282-85.  The NPET evaluated the access and concluded that "[i]f [the bilge access issue] can not be corrected, routine cleaning and investigation for unidentifiable leaks

---

<u>37/</u>   Section 071-1.5 provides:

Access shall be provided to bilge areas. Bilge areas are those that are below the static waterline in the full load condition as per SOW 096-3. Access is to ensure that bilges can be checked for water content and completely dewatered and wiped clean of any residue.  Bilge access points shall provide access to the lowest point of the bilge when the RB-M rests in a level position. The crew shall be able to access bilges for inspection and damage control without the use of tools.

AR 00879.

will be more difficult and time consuming" and that such a shortcoming deserved a "deficiency" rating. AR 40285. O-Tech has shown no reason why the court should conclude that this determination was irrational. The USCG considered O-Tech's proposal, even reproducing the drawings of its engine room access in its NPET Evaluation Notes. AR 40283-84. That Mr. Codega disagrees with the NPET is not a valid ground for the court to "second guess" the USCG's decision. E.g., E.W. Bliss, 77 F.3d at 449.

## 2)  Accessing the engine for casualty repairs

O-Tech was also assigned a deficiency for its failure to propose a design that provided adequate access to the sides of the engine for casualty repairs. AR 40285. 38/ According to the NPET's Evaluation Notes, from the USCG's FPR evaluation, the starter motor, solenoid and wiring connections, raw water hoses/fittings, oil hoses/fittings, marine gear oil cooler, engine oil temperature and pressure sensors, and zinc plugs are all located on the side of the engine. AR 40285-86. The NPET stated that "[t]here is no clear indication of the amount of space available on the sides of the engine to access these areas; however, . . . there appears to be less than 3 inches of clearance . . . . In addition, no insulation materials have been shown which will further decrease access space." AR 40286.

As defendant states, Mr. Codega and O-Tech fail to address to the concerns that the NPET raised regarding access to the sides of the engine. Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 17. Instead, Mr. Codega discusses the advantage of having access to the engine room spaces from two hatches, and then justifies the design by stating that "all components that are realistically repairable while underway" were accessible. Codega Decl. ¶6d). Mr. Codega also mentions the advantages that he sees in the cameraman hull design proposed by O-Tech. Id.

The requirement of section 071-1.1 of the Phase II Solicitation stipulates "safe and convenient access to all craft spaces, and for safe and convenient serviceability, maintainability and operability of all controls, systems, machinery and components." AR 00878. The requirement does not state that the design need only provide access to "all components that are realistically repairable while underway." Codega Decl. ¶6d). The NPET evaluated this aspect of O-Tech's design as deficient. O-Tech failed to argue, let alone prove, why this finding was not reasonable.

_____

38/  The relevant provisions of the Phase II solicitation that address access to the sides of the engine are sections 071-1.1, 071-1.4, and 071-1.9. See AR 00878-79.

O-Tech also argues that its FPR allows access to the sides of the engine through the design's large hatches, even when at sea.  O-Tech's Br. filed Aug. 25, 2006, at 20.  While these large hatches would allow crew members to raise the engines up onto the deck of the boat and access the sides of the engine, the NPET found this solution to be undesirable because crew members could not "perform damage control and equipment casualty response *within* the engine room."  AR 40230 (emphasis added).  The record shows that the NPET considered O-Tech's solutions to the engine access problem and found them unacceptable.  The court, therefore must defer to the USCG's technical determination, as O-Tech has failed to show that this determination was arbitrary and capricious.

### 3) Accessing the engine for routine maintenance

O-Tech also contends that the USCG's assignment of a deficiency for "difficulty performing maintenance inport was erroneous. 39/  The NPET assigned O-Tech a deficiency for the difficulty of performing various maintenance tasks inport.  AR 40285.  According to the NPET's RB-M evaluation notes, this deficiency was assigned because

> there are a number maintenance items that are considered routine Unit Level repair or maintenance tasks that are not accessible without removal of the engine or gear.  These include changing the raw water pump impeller, changing zinc plugs, inspecting or changing the starter, solenoid, and associated wiring connection, various hoses and clamps, replacement of engine oil temperature & pressure sensors, and inspection or replacement of transmission coolers and lines.

AR 40287.  O-Tech and Mr. Codega contend that O-Tech's design met the requirements of the Phase II Solicitation:  "All routine service points on the engine, waterjets, and auxiliary machinery are located where they can be readily reached [through] the provided hatches."  Codega Decl. ¶ 7a).  Moreover, Mr. Codega states that "suppliers have provided assurances that almost any piece of bolt-on equipment can be relocated or remote mounted should other issues be raised."  Id.  "The large hatches over the engines will allow for extremely easy access to the top of the engine." Codega Decl. ¶ 7c).  Mr. Codega's declaration and O-Tech's arguments, nonetheless, fail to show how the proposed design allowed the USCG to perform the tasks that the NPET identified as problematic.  The NPET throughly addressed the problem with removing an engine to perform maintenance tasks.  AR 40287-88.  Neither O-

---

39/   The relevant provisions of the Phase II Solicitation that address performing maintenance inport are Sections 071-1.1, 071-1.9, 088-1.12, 0881.1.13. See AR 00878-79, AR 00888-89.

Tech nor Mr. Codega responds to the NPET's concerns.  Mr. Codega's evaluation is based on O-Tech's drawings submitted as part of its FPR.  Codega Decl. ¶ 7a).  From these drawings Mr. Codega apparently concludes that the NPET erred.  Yet, O-Tech and Mr. Codega only assert that "the opposite is true."  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 19.  This does not satisfy O-Tech's burden of proof.

### 4) Accessing the engine room while underway

O-Tech and Mr. Codega argue that access to O-Tech's engine rooms is insufficient.  The USCG's concern was that crew members on the RB-M would be required to jump into the engine room, "twist and straddle the guard and then kneel down [into the engine space] all at the same time."  AR 40289. 40/  While O-Tech argues that it could include a ladder in its design to solve the problem, O-Tech did not include a ladder in its design; therefore, the NPET had to evaluate the proposal as it stood, without benefit of the ladder.  Although this problem alone probably would not have earned O-Tech a deficiency for engine access, the NPET's evaluation notes memorialize that the combination of problems with O-Tech's engine room led to the USCG assigning O-Tech a deficiency in this area.

### 5) Marinette's engine access

O-Tech contends that Marinette had the same shortcomings in its design as discussed above, yet only O-Tech was faulted.  O-Tech supports this allegation with Dr. Barr, who found that Marinette's Phase II design has limited engine access.  Barr Decl. ¶ 43.  Because Dr. Barr cites only Marinette's FPR design drawings, id. ¶¶ 44-46, Dr. Barr and O-Tech fail to allege anything more than a differing opinion on Marinette's engine room access.  Dr. Barr argues that access into Marinette's engine space will be "difficult;" that only the inboard sides of Marinette's engine design are accessible; and that the available access to the hull will not be possible if there is catastrophic damage to the hull.  Barr Decl. ¶¶ 44-46.

Jeffrey Curtis, defendant's expert and Technical Manager to the RB-M Project for the USCG successfully refutes each of Dr. Barr's allegations:

> [Marinette's] proposed arrangement provides the crew full access to both sides of both engines . . . . [Marinette] has clearly provided both narrative and supporting figures that show access to all areas of the engine room and engine in accordance with the RFP requirements . . . [Marinette] has clearly shown in

---

40/ The NPET found that O-Tech's design failed to meet the requirements of sections 071-1.8, 088-1.1.6, 088-1.1.8, 088-1.1.12, and 088-1.1.13 of the Phase II Solicitation.

their FPR that all areas of the engine room are accessible and the crew will have access for damage repair."

Decl. of Jeffrey Curtis, Sept. 21, 2006, ¶¶ 48-50 (citing AR 20816; AR 20117-123; AR 20814-17).

O-Tech's contention that Marinette suffered from the same problems as O-Tech's design rings hollow.  The NPET properly evaluated both Marinette's and O-Tech's FPRs and concluded that Marinette satisfied the requirements of the Phase II Solicitation and that O-Tech's design did not.   It is not the role of this court to overturn such technical determinations without the plaintiffs meeting their "high burden of proof."  See, e,g, Galen Medical, 369 F.3d at 1329 (Fed. Cir. 2004).

_____    7.  USCG's best value determination

Plaintiffs contend that the USCG erred in its best value determination because the USCG determined that Marinette, the highest priced offeror, represented the best value to the Government.  O-Tech also challenges the best value determination because the USCG acted unreasonably in excluding O-Tech and coerced O-Tech to abandon its Price Evaluation Adjustment ("PEA") for Small Disadvantaged Businesses.

1) USCG's determination that Marinette's offer was fair and reasonable

_____ According to O-Tech, the SSA's determination that Marinette's price was fair and reasonable was irrational because Marinette's price was "unbalanced and could not be found fair and reasonable."  O-Tech's Br. filed Aug. 25, 2006, at 24. 41/ O-Tech charges: "The Source Selection Decision ignores fiscal reality and recharacterizes its previous unbalanced finding as intentional underbidding of the B-3 boats."  Id.

Federal law requires that agencies "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title and the Federal Acquisition Regulations (FAR)."  41 U.S.C. § 253(a)(1)(A); see FAR 6.101 (providing that "contracting officers shall promote and provide for full and open competition in soliciting

_____

41/  Textron asserts that the USCG made a unreasonable best value determination because (1) "[the] USCG incorrectly and unreasonably evaluated Marinette as being higher technically rated than Textron;" and (2) the "USCG's evaluation of Marinette's price was premised on the pricing assistance that Marinette improperly received from EDO."  Textron's Br. (Def.) filed Aug. 22, 2006, at 22-23.  The court previously addressed these issues.

offers and awarding Government contracts"); see also 41 U.S.C. § 253b(a) ("An executive agency shall evaluate sealed bids and competitive proposals, and award a contract based solely on the factors specified in the solicitation."); FAR 15.303(b)(4) (providing similar language). This procurement utilized best-value-determination strategy where the USCG considered price and other technical factors using "the tradeoff process." AR 00999. In this case the SSA is responsible for ensuring that the Government obtain a price that is both "fair and reasonable." FAR 15.404-1(a)(1); see also FAR 15.402 ("Contract officers must–(a) Purchase supplies and services from responsible sources at fair and reasonable prices."); FAR 15.406-3(a)(11) (providing that contracting officer must document fair and reasonable pricing). This process "permits tradeoffs among cost or price and non-price and non-cost factors and allows the Government to accept other than the lowest priced proposal." FAR 15.101-1(c).

Section M.6 of the Phase II Solicitation directed the PET to evaluate the offered price proposals for completeness, price reasonableness, cost realism, and unbalanced pricing. AR 00656.

> Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly overstated or understated and poses an unacceptable risk to the Government. The Government may determine that a proposal is unacceptable if the prices proposed are materially unbalanced between line items or sub-line items. 42/

AR 00593 (emphasis added).

The RB-M contract contemplates the purchase of up to 180 RB-Ms over a base contract period of eight years. AR 00586. The solicitation instructed offerors to provide pricing considering two variables in the USCG's purchase plan. AR 00992-96. First, the USCG would decide during the life of the contract the exact number of RB-Ms that it would

---

42/   This section of the solicitation echoes the language of FAR 15.404-1(g), providing, in pertinent part:

> Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques.

Id.

purchase. Second, "the periods when the boats were manufactured could vary, depending on when the [USCG] placed orders for the boats." Def's Br. (O-Tech) filed Sept. 22, 2006 at 25; see AR 00684.

In the PET's October 20, 2005 report to the RB-M SEB, the PET found that Marinette's offered unit prices constituted unbalanced pricing. AR 71809. To analyze this factor, the USCG charted the unit prices offered by Marinette, Textron, and O-Tech. When it found unbalanced pricing in Marinette's price proposal, the PET relied on Table 6, reproduced below, to illustrate the issue:

[




]

The shaded cells represent the "anticipated ordering quantities," or the USCG's "most likely" schedule. AR 71809; Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 25. Marinette's pricing proposal, as depicted above, was unbalanced because

> [a]t first glance, one would notice that the unit price of each []shaded cell is lower than the unit price in the cell immediately above the []shaded cell. This downward trend would be normal and reasonable except that in almost all cases, the unit price in the cell immediately below the []shaded cell in each column is substantially higher than the unit price of the []shaded cell . . . . In the simplest terms, if the [USCG's] actual ordering quantities varies at all, the [USCG] will be paying a substantially higher unit price for all ordered boats.

AR 71809-10 (emphasis added). Upon this finding, the USCG notified Marinette that it must resolve the USCG's concerns with unbalanced pricing and price reasonableness to remain eligible for award. Def.'s Counter-Stmt. of Facts (O-Tech) filed Sept. 22, 2006, ¶ 50.

On June 13, 2006, the PET submitted its Report to the RB-M SEB, finding that all three price proposals were complete, reasonable, and balanced, assigning the three proposals "low risk" in the cost realism category. AR 40423. In its analysis of unbalanced pricing for Marinette, the PET submitted the following chart:

[



]

AR 40430.  Unlike its previous analysis, the NPET found that the price differences were not significant:

> While there is a significant decrease in the unit price from the unit price above the []shaded cell in each column, and although there is an increase in price from the []shaded cell to the unit price immediately below the []shaded cell, it is not a significant price increase.  Therefore, [Marinette's] prices do not constitute unbalance pricing.

AR 40430.  A review of Table 7 as compared to Table 6 shows that the earlier phenomenon, which the USCG identified as problematic, was resolved.

O-Tech does not address the specific pricing issue that the USCG identified in its initial evaluation of Marinette's Phase II price proposal.  Instead, O-Tech argues that Marinette's price was unbalanced because the price increased horizontally in each pricing period (each pricing period is designated "P1", "P2" etc. in Table 6 and 7 above).  The price difference that O-Tech points out (the horizontal price increase) manifested itself in all three offerors' price proposals. AR 40430.  Each was found to have balanced pricing. AR 40430-31.  Defendant characterizes the horizontal price increase as "unsurprising" because "any variation from the 'most likely' schedule risked an increase in the contractor's costs because

of disruption." Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 27; see also AR 71992 (discussing ways in which interruption in ordering schedule would impact Marinette's pricing schedule).

O-Tech also condemns "as without rational basis" the USCG's rationale for accepting Marinette's FPR price proposal as fair and reasonable.  O-Tech's Br. filed Aug 25, 2006, at 27.  Yet, O-Tech merely asserts, without support, that Marinette's proposal was "overpriced" and that the USCG's "conclusion that Marinette's minor drop in its price . . . [was] entirely at odds with its earlier conclusion."  O-Tech's Br. filed Aug. 25, 2006, at 27.

The RB-M contract is a competitive firm-fixed contract.  Accordingly, FAR 15.404-1(a)(2) provides that price analysis shall be used to ensure that the final agreed-to price is fair and reasonable.  Decl. of L. Scott Palmer, Sept. 14, 2006, ¶ 8; see also FAR 15.404-1(a) ("The objective of proposal analysis is to ensure that the final agreed-to price is fair and reasonable."); FAR 15.404-1(b)(2)-(3) (providing that comparison of proposed prices and comparison of previously proposed prices are two preferred methods of price analysis).  The PET concluded that Marinette's price was reasonable because adequate competition was present.  AR 40423.  43/  After the FPRs were submitted and the SEB submitted its evaluations, the SSA determined that Marinette's price proposal was found to be fair and reasonable.  AR 40441-42.  The SSA stated explicitly in its decision letter that it was the technical superiority of Marinette's design that earned it the contract:

[Marinette's] total evaluated price is $410,603,103 and was found to be reasonable with low risk for cost realism.  Given the maturity of the design and the expectation that few/minor changes are to be made after two phases of procurement, I have high confidence that [Marinette's] total evaluated price reflects the price the [USCG] will ultimately pay . . . .

The technical superiority and low technical risk of [Marinette's] proposed RB-M is clearly worth the 12% price difference of $43M.

_____

43/  As O-Tech correctly states, Marinette's price was greater than the revised government cost estimate.  AR 40425.  Defendant contends that "there are sound reasons why the Government's cost estimate may not be very useful for evaluating the offerors' prices."  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 24; see also Palmer Decl. ¶9 ("The Government estimate, developed long before proposals were received, is an internal planning document.  Offers that exceed government estimates are commonplace and not unreasonable.").  Regardless of the difference between the government estimate and Marinette's price, plaintiffs have failed to prove how the price difference necessarily should lead to finding that the NPET's conclusions were irrational.

AR 40442.  In E.W. Bliss Co., 77 F.3d at 449, the Federal Circuit stated that "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." (citing Lockheed Missiles & Space Co., v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993), and Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that the General Services Board of Contract Appeals should defer to agency's determination even if it would have chosen different proposal)).  The court finds that the USCG's decision was grounded in reason based on the technical and price evaluations at its disposal.  O-Tech has failed to show that the SSA or the USCG abused their discretion by acting arbitrarily and capriciously in finding that Marinette's price was both fair and reasonable.

## 2) Failure to consider O-Tech's price

O-Tech argues that the SSA failed to consider O-Tech's lower price when the SSA made its best value determination, thereby rendering the USCG's decision to award the RB-M contract to Marinette irrational.  This argument lacks merit.  First, the SEB fully evaluated both O-Tech's non-price and price FPRs.  See AR 40113-40122, AR 40201-320, AR 40422-40.  In its decision letter, the SSA fully considered O-Tech's technical proposal and concluded its evaluation of O-Tech by stating, "Any purported cost saving of a technically unacceptable offer need not be considered in determining best value. [O-Tech's] lower price does not outweigh its failure to meet technical requirements and the technical risk associated with its proposal."  AR 40441.  The SSA was fully aware of O-Tech's lower price, but concluded that it could not outweigh the technical deficiencies in O-Tech's proposal.  Given that the court has not found any of the USCG's technical findings arbitrary and capricious, this determination falls within the SSA's zone of discretion.  See, e.g., E.W. Bliss, 77 F.3d at 445.

Second, as defendant states, "it is perfectly appropriate for an agency to refuse to further consider an offer once it has concluded that the offer is technically unacceptable."  Def.'s Br. (O-Tech) filed Sept. 22, 2006, at 23-24; see In re The Austin Co., B-291482 2003 CPD ¶ 41; Randtron Syst., B-237354, 90-1 CPD ¶ 277.  O-Tech's proposal was the lowest rated of all three RB-M designs with "high" risk ratings in three of the four technical categories and one "disqualifying" rating and one "yellow" rating in four of the technical categories.  AR 40117-18.  A determination that its design was technically unacceptable is perfectly rational.  O-Tech has failed to give the court any reason to question the SSA's determination, and therefore the court will defer to its conclusion.

## 3) Price evaluation adjustment

O-Tech contends that the USCG "coerced" O-Tech to waive the benefit of the PEA for Small Disadvantaged Businesses as provided by FAR 52.219-23 and incorporated by

reference in section M.6.4 of the Phase II Solicitation. AR 01001; O-Tech's Br. filed Aug. 25, 2006, at 28. Following an informal e-mail exchange, on June 1, 2006, the Contracting Officer, L. Scott Palmer, wrote to Esteban Fernandez, President of O-Tech, advising Mr. Fernandez that he had determined that O-Tech was ineligible for the PEA. In the letter, Mr. Palmer gave O-Tech until June 7, 2006, to "provide a detailed explanation based on the price proposal submitted" or a "formal notice" that O-Tech waived the adjustment. AR 60023. O-Tech contends that "[f]earing it might otherwise be excluded from further competition, O-Tech waived the PEA on June 7." O-Tech's Br. filed Aug. 25, 2006, at 28; see also AR 60024. Included with the waiver was a second letter explaining O-Tech's interpretation of why it believed it met the PEA requirement. AR 60025. 44/

According to a transcript of O-Tech's Post-Award Debriefing, once O-Tech waived the PEA, the USCG took no further action. AR 90381. O-Tech maintains that, "[g]iven the short deadline and threat of non-responsibility, O-Tech had little choice in the matter [to waive the PEA]." O-Tech's Br. (Def.) filed Oct. 10, 2006, at 25.

In Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320 (Fed. Cir. 2003), the Federal Circuit reiterated its position that "in the procurement context proof of coercion requires proof of wrongful action by the government." Id. at 1330. The Rumsfeld court went on to summarize the standard: "[C]oercion requires a showing that the government's action was wrongful–i.e. that it was (1) illegal, (2) a breach of an express provision of the contract without a good-faith belief that the action was permissible under the contract, or (3) a breach of the implied covenant of good faith and fair dealing." Id. at 1331.

The record does not support O-Tech's position. It is the Small Business Administration (the "SBA") that is responsible for determining whether O-Tech qualified for the PEA, not the contracting officer. FAR 19.601(d); FAR 19.3; see In re Liberty Power Corp. B-295502, 2005 WL 696284 at *5. Although it was not stated in the June 1, 2006 letter to Mr. Fernadez, Mr. Palmer previously had informed O-Tech that he would forward the issue to the SBA if O-Tech disputed the USCG's findings. Palmer Decl., Ex. A. In an e-mail dated May 25, 2006, from Scott Palmer to Esteban Fernadez of O-Tech, Mr. Palmer stated, "Absent a satisfactory explanation or waiving the PEA, I will need to forward this matter to the Small Business Administration." Id. There was absolutely no evidence that the USCG engaged in any wrongful conduct. Once O-Tech chose to waive the PEA, O-Tech has

---

44/ O-Tech spends a considerable portion of its briefs arguing why its interpretation of the PEA was correct; however, this is irrelevant to the argument that O-Tech was coerced into providing the USCG with the waiver.

failed to prove that the USCG was under any obligation to continue to investigate O-Tech's position.

III. <u>Prejudice as an overarching finding:  Standing v. substantive prejudice</u>

Assuming that an applicable procurement regulation had been violated, analysis would next turn to whether the violation was prejudicial.  <u>See</u> <u>Bannum,</u> 404 F.3d at 1351.  The Federal Circuit originally restricted a showing of substantive prejudice to the requirement of showing a clear and prejudicial violation of a procurement statute or regulation.  <u>See</u> <u>CACI Field Services, Inc. v. United States</u>, 854 F.2d 464 (Fed. Cir. 1988).  That decision quoted the standard for recovery of procurement costs in <u>Keco Indus., Inc. v. United States</u>, 492 F.2d 1200, 1203 (Ct. Cl. 1974):  "[I]f one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated for the expense of undertaking the bidding process."  854 F.2d at 466 (parentheses omitted).

The term "prejudice" in the context of bid protests, has been confused in defining both standing and prejudice on the merits with the requirement that the protestor must show "some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award."  <u>Statistica, Inc. v. Christopher,</u> 102 F.3d 1577, 1581 (Fed. Cir. 1996); <u>see also</u> <u>Alfa Laval</u>, 175 F.3d at 1367 (citing <u>Statistica</u>, 102 F.3d at 1581 and <u>Data Gen.</u>, 78 F.3d at 1562).  This formulation conflates the relative importance of the procurement error with the standing requirement set forth as early as 1983 in <u>CACI, Inc.-Fed. v. United States</u>, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983).  <u>CACI-Fed</u> had endorsed a substantial chance standard equated to being "within the zone of active consideration."  <u>See</u> <u>id.</u> (internal quotations omitted).  <u>Statistica</u> defined "competitive prejudice" as a substantial chance of winning an award.  102 F.3d at 1581.  <u>Statistica</u> was superseded in 2001 when the Federal Circuit in <u>American Federation of Government Employees v. United States</u>, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("<u>AFGE</u>"), adopted the standing requirement of the Competition in Contracting Act, 31 U.S.C. § 3551 enacted in 1984, to delineate the standing requirement to sue "as an interested party," for injunctive relief under the 1996 ADRA.  The holding from an opinion, self-described as dealing with "standing," deserves extended quotation:

> The term Congress did choose to define standing under § 1491(b), "interested party," is a term that is used in another statute that applies to government contract disputes, the CICA.  As set forth above, the CICA explicitly defines that terms as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  31 U.S.C. § 3551(2).  Section 3551, by its own terms, applies only to contract disputes decided by the Comptroller

General of the GAO pursuant to 31 U.S.C. §§ 3551-56. However, the fact that Congress used the same term in § 1491(b) as it did in the CICA suggests that Congress intended the same standing requirements that apply to protests brought under the CICA to apply to actions brought under § 1491(b)(1). We therefore construe the term "interested party" in § 1491(b)(1) in accordance with the CICA, an hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract. This construction is consistent with the legislative history of § 1491(b)(1), which, as discussed above, indicates that Congress intended to extend the jurisdiction of the Court of Federal Claims to include post-award bid protest cases brought under the APA by disappointed bidders, such as the plaintiff in [Scanwell v. United States, 424 F.2d 859 (D.C. Cir. 1970)].

258 F.3d at 1302. 45/ AFGE post-dated CACI-Fed, which itself addressed standing, not the characterization of record support for a finding of substantive prejudice by a clear and prejudicial violation of an applicable procurement regulation. However, Bannum conflates the two. See Bannum, 404 F.3d at 1358 ("To establish prejudice Bannum was required to show that there was a 'substantial' chance that it would have received the award but for the . . . errors in the bid process."). Moreover, Bannum introduces a prejudice requirement into the arbitrary and capricious standard where it formerly reposed in the standard of clear and prejudicial violation of an applicable procurement regulation standard, so that, theoretically, a protestor can demonstrate substantive prejudice if it meets all of the procurement criteria.

Judge Braden has made a diligent effort to rationalize these melded concepts in Information Sciences Corp. v. United States, No. 05-1342C, 2006 WL 2686753, slip op. at 37 (Fed. Cl. Sept. 19, 2006), concluding that a harmless error standard has been adopted. Id. at 77. 46/ The Federal Circuit only adopted a de minimis test that formerly was applicable

---

45/   Myers Investigative and Sec. Services, Inc. v. United States, 275 F.3d 1366 (Fed. Cir. 2002), purports to follow AFGE, concluding the substantial chance rule continues to apply for standing. 275 F.3d at 1370.

46/   Information Sciences cites Metcalf Construction Co. v. United States, 53 Fed. Cl. 617, 622 (2002), for the unsupported proposition that "'minor errors or irregularities, i.e., harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision.'" (emphasis added in Information Sciences, No. 05-1342C, 2006 WL 2686753, slip op. at 37). Metcalf relies on Bannum and cites Day & Zimmerman Services v. United States, 28 Fed. Cl. 591, 597 (1997), which, in turn, cites Data General. The decisions of the Court of Federal Claims do not reflect a legal proposition unless they rest on binding precedent, which Data General is, but not for any such holding. Data General does not adopt a harmless error standard. 78 F.3d

to bid protests filed in the Court of Federal Claims under the repealed Brooks Act.  As this court explained in its Alfa Laval opinion,

> Defendant has urged the court to reject plaintiff's protest by means of adopting a *de minimis* standard.  Even if the court were to view failure to comply with a mandatory requirement *de minimis*, it could not employ such a standard because the Federal Circuit has never adopted such an approach for the Tucker Act, 28 U.S.C. § 1491(a)(1) (1993).  See, e.g., Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990 (Fed. Cir. 1996) (applying *de minimis* rule under the Brooks Act, 40 U.S.C. § 759(f)(5)(B), which allowed the agency board discretion in deciding if violation of mandatory requirement merited relief); Andersen Consulting v. United States, 959 F.2d 929 (Fed. Cir. 1992) (same).

Alfa Laval, 40 Fed. Cl. 215, at 234 n.23.

The facts of Alfa Laval illustrate the quandary in which the trial court and litigators find themselves.  A mandatory boilerplate (non-customized) procurement regulation was violated.  The violation had no practical effect, as the key defense witness testified, because certain data that it mandated were not material to the vibration testing of the purifier under procurement.  The request for the tests, however, was part of a military standard that had been used to draft the request for proposals.  See 40 Fed. Cl. at 229-30.

In the circumstances detailed in the trial court's opinion, the error was *de minimis*, minor, harmless—any fashion that one might describe a technical error of no practical import.  However, the court was constrained by Data General, the governing panel opinion at the time, to address substantive prejudice in terms of "a reasonable likelihood" of winning the contract award.  Alfa Laval, 40 Fed. Cl. at 234 (citing Data Gen., 78 F.3d at 1563 ).  Data General had approved the use of price differential in determining the presence of substantive prejudice.  See Data General, 78 F.3d at 1563.  The price discrepancy between the putative awardee and the protestor in Alfa Laval was "colossal."  Alfa Laval, 40 Fed. Cl. at 234.  Therefore, this court found that the protestor was not prejudiced by the technical procurement error.

––––––––––––––––––––

46/ (Cont'd from page 77.)

at 1562 ("We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

The continued viability of the last United States producer of this purifier expired on appeal when the Federal Circuit allowed that

> while price differential may be taken into account, it is not solely dispositive; we must consider all the surrounding circumstances in determining whether there was a substantial chance that a protester would have received an award but for a significant error in the procurement process. In issuing the RFP here, the government sought proposals that met certain requirements. Alfa Laval, an irrefutable competent supplier, submitted the only bid meeting all of the government's requirements, at a lower per-unit price that it had charged for the same purifiers in two recent procurements; it must have had a substantial chance to receive the contract award.

175 F.3d at 1368. The denouement is arcing the circle back to one of the formulations of standing: The protestor had a fully compliant technical proposal.

Respectfully, this court suggests that any prejudicial error in the procurement process sufficient to upset an award must be significant 47/ to the overall decision to award the contract to the apparent awardee. When the court finds a violation of an applicable procurement regulation, the court should determine as a factual matter that the protestor has been prejudiced. This court proposes that the prejudice analysis should not focus on whether the protestor had a "substantial chance" of receiving the award because it had a fully compliant proposal, but, rather, whether the procurement violation was significant to the protestor's chance of being awarded the contract. This prejudice analysis, however, should be reached only when the protestor has shown violation of an applicable procurement regulation. If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding. There should be no need to continue to prejudice, because a finding that the Government has acted arbitrarily and capriciously necessarily invalidates the procurement, and the court must enjoin the procurement award or enjoin performance under an award already made, and the court also may enjoin award to any proposer than the protestor.

---

47/ Realizing that Data General's formulation of an "allegedly significant error" was included in Statistica's rejection of Data General's "reasonable likelihood" standard, 102 F.3d at 1582, this court suggests that the Data General description of an error as 'significant" is helpful from a trial court's perspective.

A.  Prejudice to plaintiffs

In the instant case, the court need not reach the question of prejudice.  Of the many numerous technical challenges raised by plaintiffs, the record does not contain sufficient support for the court to find that the USCG has acted arbitrarily or capriciously.  Moreover, plaintiffs have failed to show prejudicial violation of an applicable procurement regulation. 48/

Assuming, however, that the USCG irrationally failed to remove a "weakness" from Marinette's Mission Effectiveness rating for range, or that Marinette should have received a "red" rating, the result would not resolve which offeror should be the putative awardee. O-Tech could not qualify as an awardee, as it still held a valid "red" rating for range. Textron would qualify, but the court would have the option either to prevent the award to any proposer other than Textron or to declare the procurement invalid and leave the USCG to reassess the matter — without judicial supervision, of course.  Under the second option, the USCG could conduct a new Phase II Solicitation.  Under the first option, the court has determined that it would not enjoin an award to any proposer other than Textron.  The rather singular circumstances of these protests have required a full record review of every action taken under the procurement evaluation criteria.  The court has read the technical evaluation of the RFP.  Marinette, overall, offered the best boat.  The USCG would have been buying Textron's promises to build a boat according to the Phase II Solicitation.   In these circumstances, the court would not have exercised its discretion to give the USCG no option other than Textron.  See Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 864 (D.C. Cir. 1970) (responding that "there is no right in [a disappointed bidder] to have the contract awarded to it in the event the [] court finds illegality in the award of the contract").

B.  Plaintiffs do not succeed on the merits

Plaintiffs fail to meet their burden of proof regarding success on the merits because none of the USCG's actions have prejudiced plaintiffs.   See 5 U.S.C. § 706(2)(A). Therefore, plaintiffs fail this prong of the injunction test.  See PGBA, LLC, 389 F.3d at 1228-29.

---

48/ The omission of any other procurement challenges in this lengthy opinion is not an oversight.  Each was considered, if not discussed.

IV. Other factors necessary for injunctive relief

While success on the merits is the most important factor, "[n]o one factor, taken individually, is necessarily dispositive." FMC, 3 F.3d at 424. "[T]he absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." Chrysler, 908 F.2d at 953. Besides (1) success on the merits, injunctive relief requires a plaintiff to demonstrate that (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) the injunction is not against the public interest. PGBA, 389 F.3d at 1228-29; FMC, 3 F.3d at 427.

Plaintiffs have shown irreparable harm. "An action at law only allows recovery of 'bid preparation costs in a suit for damages, but not loss of anticipated profits,' leaving a bid protestor irreparably harmed." Bannum, 60 Fed. Cl. at 730 (quoting Essex Electro Eng'rs, Inc. v. United States, 3 Cl. Ct. 277, 298 (1983), aff'd, 757 F.2d 247 (Fed. Cir. 1985)). The financial harm to plaintiffs is displaced by the harm to the USCG and Marinette because of plaintiffs' failure on the merits and the significant expenses that the USCG would be forced to pay if a permanent injunction were to be issued. The court denied a preliminary injunction during these proceedings and the USCG has gone forward with the Marinette RB-M contract. Order entered July 20, 2006, ¶ 1. As of October 16, 2006, the USCG has paid over [

] to Marinette for work performed on the RB-M contract. Decl. of L. Scott Palmer, Oct. 16, 2006, ¶ 6. 49/ If the court were to enter a permanent injunction, the USCG would be responsible for termination costs, as well as costs incurred by Marinette, but not yet paid. Id. The USCG would also be forced to re-evaluate the Phase II Solicitations or procure "Textron's substantially-less-capable boats." Def.'s Br. (Textron) filed Oct. 16, 2006, at 28 n.22. Therefore, the court finds that the financial harm to plaintiffs is not as strong as the harm to the USCG and Marinette.

Finally, the court must consider whether an injunction would be in the public's interest. In making this determination the court must consider matters of national defense and national security in providing relief. 28 U.S.C. § 1491(b)(3) ("[T]he court[] shall give due regard to the interests of national defense and national security and the need for

_____

49/ In the court's September 19, 2006, order, which granted defendant's motion for an enlargement of time to file its cross-motion and opposition, the court granted plaintiffs' request to not consider this extension period when evaluating prejudice. See Order entered Sept. 19, 2006, ¶ 3. The court has not considered this time period when assessing prejudice to the Government.

expeditious resolution of the action.")  The Federal Circuit had occasion to consider the meaning of 28 U.S.C. §1491(b)(3) in <u>PGBA</u>, 389 F.3d 1219, concluding that "section 1491(b)(3) merely instructs courts to give due regard to the issue of national defense and national security in shaping relief."  <u>Id.</u>

Plaintiffs have not proven that the injunction is in the public interest.  The USCG made a rational decision that complied with all applicable regulations and selected Marinette as the contractor that, under the stated criteria set forth in the Phase II Solicitation, would benefit the Government and the public.  Moreover, defendant has shown that the ability of the USCG to respond to emergency missions is being hampered by the continued delay of this procurement; the fleet of boats the RB-Ms will replace is aging, and they are being used beyond their "natural operating life."  Tr. at 205.  Thus, they are less reliable and need frequent repairs, resulting in fewer boats available for the USCG.  <u>See id.</u>

## CONCLUSION

Based on the foregoing, defendant's and Marinette's cross-motions for judgment on the administrative record are granted, and plaintiffs' cross-motions for judgment on the administrative record are denied.  Accordingly,

1.  The Clerk of the Court shall enter judgment for defendant and Marinette.

2.  By November 15, 2006, the parties shall identify by brackets any material subject to redaction before the opinion issues for publication.

**IT IS SO ORDERED**.

s/  Christine O.C. Miller
**Christine Odell Cook Miller**
Judge